[No. A116712. First Dist., Div. One. July 25, 2008.]

GOLDEN GATE WATER SKI CLUB, Plaintiff and Appellant, v.
COUNTY OF CONTRA COSTA et al., Defendants and Respondents.

## COUNSEL

The Zumbrun Law Firm, Ronald A. Zumbrun, Timothy V. Kassouni and Angela C. Thompson for Plaintiff and Appellant.

Silvano B. Marchesi, County Counsel, and Thomas L. Geiger, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**STEIN, J.**—Golden Gate Water Ski Club (the Club), a private nonprofit organization dedicated to the recreational sport of water skiing, appeals from an order denying its petition for writ of mandate and from a judgment dismissing its complaint. The trial court's rulings leave in place an order by the Contra Costa County Board of Supervisors (the Board) ordering destruction and removal of all the dwelling units, outhouses and docks the Club and its members had erected or installed on Golden Isle. We affirm.

### BACKGROUND

Golden Isle is a five-acre island in the San Joaquin Delta in Contra Costa County (the County). It is in an area designated "open space" in the County's general plan. The most appropriate uses for property designated "open space" involve resource management, such as maintaining critical marsh and other endangered habitats, or establishing safety zones around identified geologic hazards. The County has a land use ordinance limiting urban development in the County to 35 percent of its land, reserving the remaining 65 percent for agriculture, open space, wetlands, parks and other nonurban uses. It has established an urban limit line and limits urban uses to lands lying within the urban limit line. Golden Isle lies approximately two miles outside of the urban limit line. Golden Isle also lies in a district zoned A-2 agricultural. Parcels in A-2 districts must have a minimum of five acres. The zoning generally allows no more than one detached single-family residence per parcel plus such accessory structures and uses consistent with a single-family

residence. Other uses may be allowed if the landowner obtains an appropriate land use permit. These uses include publicly owned parks, community buildings, clubs, and activities of a quasi-public, social, fraternal, or recreational character, such as golf, tennis or swimming clubs, or veterans or fraternal organizations. A land use permit for such uses may be granted only if a number of conditions exist or are met. A permit may not be granted if the proposed use affects the orderly development of property within the county, affects the policy and goals set by the county's general plan, or encourages marginal development within the neighborhood. (Contra Costa County Code, § 26-2.2008.)

The Club purchased Golden Isle in 1966. By 1970, without obtaining any land use or related permits, the Club had built or installed at least 15 residential dwelling units on the island in the form of cabins and/or travel trailers, plus decks, docks and other related structures. On July 1, 1970, the County's building inspection department notified the Club its use of the island violated the County's land use requirements and was not permitted. The Club did not cease its use of the island nor did it remove the dwelling units and other structures. To the contrary, still without obtaining any land use or related permits, the Club added to the development, so that by 2003 the development on Golden Isle had grown to 28 residential dwelling units, 28 docks and various outbuildings. The development violates the County's land use requirements, as well as state and local health codes and ordinances, including requirements for water, sewage, floodplain management and land preservation.

In 2003, after conducting a site inspection of Golden Isle, the County posted a notice of violation at the site. Over the next two years, the Club met with County personnel several times, making various proposals in an attempt to continue its use of the island without significant change. For example, the Club proposed to reduce the development, but could not say exactly how it would be reduced. It offered to construct "breezeways" between a number of the residences on the site, apparently hoping the County would view several structures attached by means of these breezeways as being but a single residence. The County found none of Club's proposals to be viable in light of the land use restrictions and the reasons for these restrictions.

On February 23, 2005, the county abatement officer issued a notice and order to abate a public nuisance by demolishing and removing all structures from Golden Isle. The Club appealed the notice to the Board, which affirmed the abatement officer's determination and ordered the Club to abate the public nuisance by demolishing and removing all structures within 90 days of the Board's order. The Club then petitioned the superior court for an administrative writ of mandate seeking an order setting aside the Board's findings and

order. At the same time the Club filed a complaint for inverse condemnation, violation of civil rights, injunctive relief, fraud and declaratory relief. The court denied the Club's petition. It then sustained the County's demurrer to the Club's complaint and entered judgment dismissing the complaint, ruling that the theories of recovery stated in the complaint had been conclusively determined against the Club when the court denied the Club's petition for writ of mandate.[1]

The Club has appealed from the denial of its petition and from the judgment. We granted the Club's petition for writ of supersedeas staying enforcement of the abatement order pending appeal.

### DISCUSSION

### I.

### Nuisance

■ The Club complains its development is not a "public nuisance" as defined by Civil Code section 3479, providing a "nuisance" is "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway." That definition is not at issue. Violations of a planning code constitute a public nuisance. (*City and County of San Francisco v. Padilla* (1972) 23 Cal.App.3d 388, 401 [100 Cal.Rptr. 223].) In *Flahive v. City of Dana Point* (1999) 72 Cal.App.4th 241, 244 [85 Cal.Rptr.2d 51] (*Flahive*), for example, a homeowner's conversion of half of her garage into two studio apartments without obtaining permits violated the municipal code, which made it a nuisance, and the city was entitled to remove the apartments. (*Id.* at pp. 243–245, 248.) In any event, the County has a constitutional right to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) It therefore is not particularly relevant whether a particular violation of a zoning law is or is not a public nuisance, or whether a county, as opposed to a city, has the power to declare

---

[1] The court also ruled the County was statutorily immune from the Club's claim for fraud. The Club does not appeal from that ruling.

the violation a nuisance.[2] Unless the enforcing authority's declaration of nuisance in some way misleads the landowner into misunderstanding the nature of the violation, it is enough that the authority has the power to act. The Club cannot reasonably claim to have been misled into believing the order of abatement was based on the statutory definition of "public nuisance" as opposed to the claim the Club was violating the County's land use ordinances.

The Club, citing *Flahive*, asserts a governmental entity's designation of a nuisance "does not necessarily make it so." Again, as the Club was fully aware of the County's reasons for demanding it remove the structures from Golden Isle, it is of little importance that the County characterized its order as the abatement of a nuisance. In any event, while the *Flahive* court did state that the city's "designation of a nuisance does not necessarily make it so" (*Flahive, supra,* 72 Cal.App.4th at p. 244, fn. 4), it was addressing the situation where there is some factual dispute which, if determined in favor of the landowner, would mean the landowner was not in fact violating zoning law or land use ordinance. (See *Leppo v. City of Petaluma* (1971) 20 Cal.App.3d 711, 718 [97 Cal.Rptr. 840], cited by *Flahive* in support of the statement made in *Flahive,* at p. 244, fn. 4.) There is no factual dispute that the Club's development violates the County's land use and related ordinances.

## II.

### Equitable Estoppel

Although the Club contends it had some sort of right to develop the island, it does not and cannot claim its development was allowed by the County's land use requirements at the time it purchased Golden Isle, or that the land use requirements have changed since that time to allow its development, or that the County ever sanctioned its development by means of granting a land use permit or its equivalent. The Club's actual claim, therefore, is not that it ever had or has gained a right to develop the island, but that principles of equity bar the County from abating the Club's illegal use. The claim essentially attacks the Board's order as an abuse of discretion. Code of Civil Procedure section 1094.5 permits trial court review of quasi-judicial administrative decisions, that is, decisions that result when the agency has exercised its discretion and applied the governing regulations and law to a particular factual situation. For this purpose, an abuse of discretion is established if the

---

[2] The Club points out Government Code section 38771 provides, "By ordinance the city legislative body may declare what constitutes a nuisance," but no similar statute confers authority on a county to declare what constitutes a nuisance.

respondent has not proceeded in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence. (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 124 [109 Cal.Rptr. 799, 514 P.2d 111] (*Selby*).) To the extent the question turns on factual disputes, we review the trial court's ruling in the light most favorable to the judgment, considering only whether it is supported by substantial evidence. (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360 [56 Cal.Rptr.3d 591] (*Feduniak*).) Where, as is essentially true here, the facts are undisputed, and there is only one inference to be drawn, whether estoppel applies is a question of law. Finally where, as also is true here, the issues require a weighing of policy concerns, they present a question of law. (*Ibid.*; *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 320–321 [82 Cal.Rptr.2d 649] (*Toigo*).)

▮ The Club contends it is entitled to relief on a theory of equitable estoppel. "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) Although the defense does not apply when even one of the elements is missing (*Feduniak, supra*, 148 Cal.App.4th at p. 1360), the Club primarily focuses on the third and fourth elements, claiming the County's communications and lack of communications misled the Club into believing its development of Golden Isle was and would be allowed.

After first notifying the Club in 1970 that its use violated land use and zoning laws, the County suggested the Club file an application to have Golden Isle rezoned T-1, which would allow for a mobilehome park, and also advised the Club to apply for a land use permit for a trailer park. One year later the Club filed the applications. A year after that, the County advised the Club to withdraw its applications, informing the Club it had researched the possibility of rezoning and had determined the Club's development would not and could not comply with the requirements for a mobilehome park. The Club did not withdraw its applications and, as noted above, continued its illegal use of the island, adding to the structures already in place.

The Club asserts a County employee informed the Club's attorney in 1974 that the County would not "hassle" the Club over its violations. It seems the County took no further action about the Club's use of the island until 1979, when it wrote again advising the Club to withdraw its applications. The Club correctly asserts the 1979 communication was prompted, at least in part, by

the concern the Club's applications automatically would be approved by reason of the 1977 Permit Streamlining Act (Gov. Code, § 65920 et seq.). Those concerns, however, were unfounded[3] and were not communicated to the Club. The County wrote it planned to establish a committee to address concerns about recreational uses in the Delta, would contact the Club before the committee was formed and invited the Club to participate in the committee. The Club at that time did withdraw its applications. No committee was formed and the Club simply continued to use and develop the island.

On these facts the Club could not reasonably have assumed its development complied with the County's ordinances. To the contrary, the County at all times maintained that the development was illegal. At the most, the County's inaction for several years, together with the representation of a single employee in 1974, might have led the Club to believe the amount of development existing in the early 1970's would be tolerated, at least during the administration in place at that time. Nothing in the employee's representation or the County's inaction reasonably could lead the Club to believe the County never would enforce its land use requirements. The Club also has failed to show it has suffered actual injury resulting from some act or omission that might be imputed to the County. The pre-1970 development took place without any permits and without any communication with the County. Nothing in the County's later action or inaction justified the decision to add to the structures on the island after 1972. That the Club erected additional structures therefore cannot provide grounds for an estoppel. For the same reason, the expense of abatement, while substantial, does not support application of the doctrine.

The Club asserts it withdrew its applications "in reliance" on the County's representation it planned to form a committee to address concerns about recreation in the Delta. As the applications would not have been granted in any event and always could have been refiled, the Club suffered little injury from its reliance. The Club points out it paid taxes on the illegal structures. The Club does not contend its payment was based on some understanding the structures thereby would be made legal or that their illegality rendered them

---

[3] The act requires a public agency that is the lead agency for a development project to approve or disapprove the project within a specified time period (Gov. Code, § 65950, subd. (a)), further providing that the agency's failure to act within the specified time limit shall be deemed approval of the permit application for the development project. (Gov. Code, § 65956, subd. (b).) It is settled an application for rezoning may not be deemed approved by operation of law under the time limitation provisions of the act. (*Land Waste Management v. Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3d 950, 955 [271 Cal.Rptr. 909]; *Landi v. County of Monterey* (1983) 139 Cal.App.3d 934, 935–937 [189 Cal.Rptr. 55].) It also does not require permit applications be deemed approved if not acted upon within the statutory period if the applications would require legislative changes in applicable zoning ordinances, general plans or other controlling land use regulation. (*Land Waste Management v. Contra Costa County Bd. of Supervisors*, at p. 961.)

immune from taxation. For the most part the Club's reliance simply was to continue its illegal use of the island until it finally was compelled to desist. That is not an injury allowing the defense of equitable estoppel.

We conclude the Club did not show it was "ignorant of the true facts" in that, at least as of 1970, it was aware its development violated the County's land use and zoning laws. The Club also did not show it suffered actual injury in reliance on the County's actions or inactions. As the Club has not established at least two of the elements of the doctrine of equitable estoppel, we need not consider that defense further.

■ There is, however, another reason for rejecting the defense. A party "faces daunting odds in establishing estoppel against a governmental entity in a land use case. Courts have severely limited the application of estoppel in this context by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. [Citation.] The overriding concern 'is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits.' [Citation.] Accordingly, estoppel can be invoked in the land use context in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' [Citation.]" (*Toigo, supra,* 70 Cal.App.4th at p. 321.)

The Club is correct that the Supreme Court has ruled the doctrine is not absolutely barred in land use cases. In *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*), the court found, "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and . . . the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Id.* at pp. 496–497; see also *id.* at p. 500.) Nonetheless, "an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . . .' " (*Id.* at p. 493.)

■ "In the field of zoning laws, [the courts] are dealing with a vital public interest—not one that is strictly between the municipality and the individual litigant. All the residents of the community have a protectable property and personal interest in maintaining the character of the area as established by comprehensive and carefully considered zoning plans in order to promote the orderly physical development of the district and the city and to prevent the property of one person from being damaged by the use of

neighboring property in a manner not compatible with the general location of the two parcels. [Citation.] These protectable interests further manifest themselves in the preservation of land values, in esthetic considerations and in the desire to increase safety by lowering traffic volume." (*Pettitt v. City of Fresno* (1973) 34 Cal.App.3d 813, 822–823 [110 Cal.Rptr. 262], fn. omitted (*Pettitt*).) It follows that the doctrine of equitable estoppel will not be invoked as a matter of law even where a property owner relies on a permit issued by the public entity but the permit violates a zoning ordinance. (*Id.* at p. 819.) "To hold that [the public entity] can be estopped would not punish the [public entity] but it would assuredly injure the area residents, who in no way can be held responsible for the [public entity's] mistake. Thus, permitting the violation to continue gives no consideration to the interest of the public in the area nor to the strong public policy in favor of eliminating nonconforming uses and against expansion of such uses." (*Id.* at p. 823.) In addition, even aside from any direct injury to the public interest resulting from a violation of land use regulations, public policy "may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." (*Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775 [9 Cal.Rptr.2d 120] (*Smith*).)

Numerous cases have refused to apply the doctrine against a governmental entity despite substantial and reasonable reliance by the landowner on some act or dereliction of the public entity. In *Pettitt*, for example, landowners purchased a building having two addresses on the understanding, based in part on a representation by the city, that both addresses had a nonconforming right allowing retail commercial use in an area zoned single family residential. The landowners obtained a building permit and spent substantial sums to remodel a building so that the entire building could be used as a beauty salon. The building permit violated the city's zoning ordinance, which did not authorize retail-commercial use for one of the addresses. (*Pettitt, supra*, 34 Cal.App.3d at pp. 816–817, 819.) The city was not estopped from denying the validity of the building permit. (*Id.* at p. 824.) In *Smith*, a telephone communications company (TMC) obtained a land use permit allowing it to build a telephone microwave station, after which it expended substantial sums in good faith reliance on the permit. (*Smith, supra*, 7 Cal.App.4th at p. 773.) The permit was not in substantial conformity with the conditional use permit on which it was based and should not have been issued before an environmental assessment was prepared. In refusing to apply the doctrine of equitable estoppel, the court held, "The instant case would establish a broad precedent allowing government to operate in violation of its own laws. [¶] It is not enough to say that public policy will not be adversely affected by the application of estoppel because TMC's structure creates no health or environmental hazard. The point is that public policy may be adversely affected by

the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." (*Id.* at p. 775.)

In *Feduniak, supra*, 148 Cal.App.4th 1346, landowners purchased residential property that, in violation of a California Coastal Commission (Commission) open space easement, had been landscaped to include a three-hole pitch-and-putt golf course. The golf course, visible from the street, had been in place for 18 years and the plaintiffs purchased the property because of the golf course. After the plaintiffs purchased the property, the Commission issued orders requiring them to comply with the easement by removing the course and restoring the land to its natural state. (*Id.* at pp. 1354–1355.) The court refused to apply the doctrine of equitable estoppel notwithstanding the landowners' reasonable belief the use was allowed, the failure of the Commission to act on an earlier date, and the substantial expense to the landowners of restoring the land to its natural state. "[E]stopping the Commission because of its prior regulatory inaction would nullify otherwise valid restrictions adopted for the public benefit . . . . Estopping the Commission does not punish the Commission. It would, however, injure the public, which has a strong interest in a scenic natural coastline with native vegetation . . . ." (*Id.* at p. 1377.) "Moreover, applying estoppel because of regulatory inaction could undermine the Commission's ability to enforce existing and future permit restrictions on property along the entire coast that the Commission has not been able to monitor for compliance." (*Id.* at pp. 1377–1378.)

In *Toigo*, the plaintiffs alleged that in rejecting their first application to subdivide a parcel, the Town of Ross led them to believe a second application would be accepted if it incorporated certain design specifications. The plaintiffs responded by redesigning the proposal, but the town denied their second application. (*Toigo, supra*, 70 Cal.App.4th at pp. 314–316, 317–318.) The court refused to apply the doctrine of equitable estoppel. "Courts have yet to extend the vested rights or estoppel theory to instances where a developer lacks a building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted. To the contrary, it has been stated that ' "[w]here no such permit has been issued, it is difficult to conceive of any basis for such estoppel." [Citations.]' " (*Id.* at p. 322.)[4]

---

[4] The Club contends there is no "building permit rule" categorically precluding the defense of equitable estoppel in cases where development has taken place without first obtaining an appropriate permit. We do not rule on that contention, but note the absence of a permit is relevant both to the question of the public interest underlying the necessity of permits and to the reasonableness of the landowner's conduct in building without a permit.

■ These cases establish that in the absence of exceptional circumstances, the doctrine of equitable estoppel will not be applied to allow a landowner to circumvent land use restrictions even when the landowner relies on the public entity's express representation that the landowner's plans comply with the entity's land use requirements, and certainly not when the public entity simply fails to take early action to warn the landowner the plans violate the land use requirements. There are less compelling reasons here for applying the doctrine than there were in many, if not all, of the cases we have discussed. We see little injustice in compelling the Club to remove structures constructed or installed without a permit either before contacting the County or after the County informed it the development was illegal, and without even attempting to comply with the law. In sum, what little injustice might result from abating the Club's illegal use presents no grounds for overriding the significant interest in open space and other land use limitations benefitting the public interest.

The Club cites *Anderson v. City of La Mesa* (1981) 118 Cal.App.3d 657 [173 Cal.Rptr. 572]. There, the plaintiff constructed a house that had one wall seven feet from the side lot line. The construction complied with a general zoning ordinance requiring single-family dwellings to be set back at least five feet from the side lot lines; the city had issued a building permit allowing the construction and the city inspected the house six times during construction. After the construction was complete, the city refused to issue a permanent occupancy permit, citing a specific plan ordinance requiring the house to be set back at least 10 feet from the side lot line. (*Id.* at p. 659.) The landowner's use of the property was perfectly consistent with the uses for the area and the violation involved nothing more than a two-and-one-half-foot setback encroachment, creating no special problem for the area or adjacent landowners. The case provides no authority for the proposition that a governmental entity may be estopped from requiring a landowner to cease a use inconsistent with the uses the public, through its local government, allows for the area.

*Mansell* involved extraordinary circumstances. The government not only had encouraged private development of tidelands but itself had dredged, filled and reclaimed the tidelands, with the result that the public and private development, together with natural alterations to the shoreline, created insoluble title and boundary problems. (*Mansell, supra,* 3 Cal.3d at pp. 469–473.) The government itself wished to relinquish its claims to the tidelands. (*Id.* at pp. 475–477.) Further, the combined actions of the government and private developers had "resulted in an area providing an impressive array of public facilities for navigation and recreation." (*Id.* at p. 500.) In a sense, then, the development furthered the public interest at stake: preventing the alienation of public lands into private lands that could not be enjoyed by the public. (*Ibid.*) Finally, the Supreme Court found, "Even more significant,

we think, from the standpoint of assessing the effect of estoppel upon the public policy in question, is the fact that the rare combination of government conduct and extensive reliance here involved will create an extremely narrow precedent for application in future cases. . . . We are here concerned with thousands of homeowners who, through the long continuing conduct of the government entities involved, have been led to believe and have acted upon the belief that the lands upon which they reside are their own private properties. Because similarly compelling circumstances will not often recur, the public policy [at issue] will not suffer substantial erosion as a result of the decision we reach today." (*Ibid.*) The present case by no stretch of the imagination approaches the exceptional circumstances present in *Mansell.* The Club is not entitled to the defense of equitable estoppel.

## III.

### Laches

The Club contends that even if it cannot establish grounds for invoking the doctrine of equitable estoppel, the related doctrine of laches applies to prevent the County from enforcing its land use laws. " 'Laches is an equitable defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.] " 'The defense of laches requires unreasonable delay plus either acquiescence in the act about which the plaintiff complains or prejudice to the defendant resulting from the delay.' " [Citation.] [¶] Laches is a question of fact for the trial court, but may be decided as a matter of law where, as here, the relevant facts are undisputed. [Citation.]' [Citation.]" (*Feduniak, supra,* 148 Cal.App.4th at p. 1381.) "[A]s with estoppel, laches is not available where it would nullify an important policy adopted for the benefit of the public. [Citations.]" (*Ibid.*) Laches was not available in *Feduniak,* and it is not available here because applying it would nullify an important policy adopted for the public benefit.

The Club cites two cases for the proposition the doctrine of laches is available in land use cases even when the doctrine of equitable estoppel is not. Although there is some support for such a proposition in each case, neither compels the conclusion that delay by the government coupled with reliance by the landowner will allow the defense of laches where the damage to the public interest would prevent the application of equitable estoppel. We can conceive of no reason why the public interest should be of paramount importance in connection with the doctrine of estoppel but be outweighed by other considerations in connection with laches. In any event, in both *People v. Department of Housing and Community Dev.* (1975) 45 Cal.App.3d 185 [119 Cal.Rptr. 266] (*Department of Housing*) and *City and County of San Francisco v. Pacello* (1978) 85 Cal.App.3d 637 [149 Cal.Rptr. 705] (*Pacello*),

the use in question had been permitted at one time (indeed, in *Pacello* the use was permitted at the time of the proceedings), at least one governmental agency aligned itself with the property owner, and the evidence strongly indicated the use in question had or would have little or no detrimental effect on any public interest or policy.[5] The same considerations are not present here.

---

[5] In *Department of Housing*, a landowner applied to a city for a building permit for a mobilehome park in an area zoned for that use, and offered to submit an environmental impact report (EIR) on the project. The city attorney took the position an EIR was not required. The department of housing agreed, asserting the city was required only to inform the state that a mobilehome park was a permitted use under the local zoning ordinance. The city issued the landowner a building permit and wrote a statement that the proposed use was permissible under a local zoning ordinance. The department then issued a mobilehome park construction permit. The landowner commenced site preparation and construction, spending approximately $40,000. At that point the county district attorney filed a petition for writ of mandate, seeking an order compelling the department of housing and its director to rescind the construction permit for having been issued in the absence of an EIR or negative declaration under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). (*Department of Housing, supra*, 45 Cal.App.3d at pp. 188–189.) In the meantime the city had adopted a new zoning ordinance with setback provisions the landowner could not meet were he required to begin the process anew. (*Id.* at p. 198.)

The court reasoned that although there is a significant public interest in ecology preservation, it could be assumed the effect on the ecology of allowing the project to go forward was slight. "[W]hen the developer applied for a construction permit, his plans conformed to local zoning demands without need for a variance, thus justifying the inference that its environmental disadvantages were minimal." (*Department of Housing, supra*, 45 Cal.App.3d at p. 198.) In addition, the court found the proceeding to be "novel," pointing out it had been brought by one representative of the state against another. (*Id.* at p. 197.) "The state here contends with itself through separate spokesmen, each espousing the general public interest, each expressing a conflicting view concerning the law and the status of the citizen who stands before the law." (*Ibid.*) The court concluded, "The state's failure to commence its suit before the citizen incurred heavy loss created an injustice which outweighs any adverse effect of the state's failure to make timely environmental inquiries. We sustain the defense of laches." (*Id.* at p. 200.)

In *Pacello, supra*, 85 Cal.App.3d 637, decided by this appellate division in 1978, the defendant property owners had purchased a two-story building consisting of a principal unit and an occupied housekeeping unit in the rear portion of the ground floor level. Five years later the zoning administrator informed the property owners, incorrectly, that the ground floor unit was illegal. The board of permit appeals ruled the administrator had erred or abused his discretion, finding the building conformed to the requirements of the planning code and related ordinances. Eight and one-half years later the city and county, basing its action on the administrator's ruling, filed proceedings to abate the ground floor unit as a public nuisance. (*Id.* at pp. 640–641, 644.) The trial court ruled San Francisco's action was barred by the doctrine of laches. This court affirmed. Although, unlike the situation in *Department of Housing, supra*, 45 Cal.App.3d 185, there appeared to be little evidence of actual prejudice to the property owners ("terminating benefits a defendant has been receiving because the plaintiff has been delaying does not, of itself, constitute prejudice"), there was at least some evidence the property owners were prejudiced by the delay between the zoning administrator's order and the institution of the abatement proceedings. (*Pacello*, at pp. 644–645.) The court pointed out the property owners had acted in good faith, San Francisco's delay was unexplained, and "city and county,

## IV.

## Limiting Abatement Order

The Club contends that even if there is no justification for reversing the County's abatement order in its entirety, this court should "craft an equitable decree consistent with 'novel conditions' presented in this appeal." The "novel conditions" appear to be little more than that the County allowed the Club to enjoy the benefits of its illegal development for many years and later rejected various proposals to allow the Club to reduce but not eliminate the structures it built without benefit of permit or other official sanction. We find nothing in these conditions, or in the Club's actions in filing or withdrawing applications or paying taxes on its structures, or in the argument that the Club's use was at one time tolerated, that should limit the County's discretion to order total abatement. To the contrary, granting the Club partial relief would encourage others to violate land use and zoning ordinances on the assumption or hope their continued violations will allow them to circumvent the planning process. Finally, while the Club perhaps is to be commended for the positive things it may have done to preserve the shoreline or the quality of the Delta's water, or to educate people about boating and water skiing, it remains true that the Club made no attempt to bring its operations within the requirements of the law.

The Club contends the abatement order is overbroad, pointing out an A-2 district allows a single-family residence, while the order requires the Club to demolish all the structures on Golden Isle. In similar vein, it contends one or more structures might be deemed a community building or club allowed in an A-2 district for quasi-public, social, fraternal or recreational character if the user has obtained a land use permit. The Club obtained no land use or related permit before erecting or installing any of the structures on the island. Every structure therefore is illegal even if some structure might have been allowed had the Club complied with the law. The Club has made no attempt to fulfill the conditions necessary to obtain a land use permit to build a structure supporting its recreational activities, and in light of the open space designation, among other things, there is little reason to think a permit will, or would have been, granted had the Club taken appropriate action.[6] In addition, again, limiting the abatement order could only encourage like violations. The

---

acting through the city attorney, [was] seeking to retake what it, through the board of permit appeals, had long since given." (*Id.* at p. 647.)

[6] The Club did apply to the United States Army Corps of Engineers for permits for its docks, piling, houseboats, walkways, mooring and bulkhead. This process brought the Club in contact with the United States Environmental Protection Agency and the United States Fish and Wildlife Service. The record does not indicate whether a permit ever was issued.

County did not abuse its discretion by ordering the Club to remove all structures.

The Club complains that had the County attempted to *enjoin* the Club from its illegal use of Golden Isle, it could not have obtained an order requiring all structures to be demolished. The contention is based on cases holding when a nuisance is not a nuisance per se, a court should limit the scope of an injunction, taking only those measures which would afford the relief to which the enjoining entity is entitled. (E.g., *People v. Mason* (1981) 124 Cal.App.3d 348, 353–354 [177 Cal.Rptr. 284].) The "nuisance" at issue here is, or at least is comparable to, a nuisance per se in that it violates the County's land use ordinance. The cited cases, therefore, have no persuasive value. In addition, as we have discussed, every structure on the island is illegal.[7]

## V.

### The Demurrer

The trial court sustained the demurrer to each cause of action alleged in the complaint "because this court's order denying the writ of administrative mandate conclusively determined the cause of action against [the Club]." The Club characterizes this ruling as an application of the law of res judicata and collateral estoppel which preclude parties from relitigating a cause of action that has been finally determined by a court of competent jurisdiction. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701 [107 Cal.Rptr.2d 149, 23 P.3d 43]; *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 810 [122 P.2d 892]; *Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 243–244 [244 Cal.Rptr. 764].) Having identified the trial court's ruling as an application of these doctrines, the Club contends they do not apply because, as the denial of the petition was subject to appeal, there has been no final judgment on all the issues between the parties. (See *People ex rel. Gow v. Mitchell Brothers' Santa Ana Theater* (1980) 101 Cal.App.3d 296, 306 [161 Cal.Rptr. 562].) The argument misstates the nature of the trial court's ruling, which simply was that having determined the relevant issues against the Club in connection with the writ proceedings, the court would not revisit its reasoning in connection with the complaint. By upholding the abatement order, the court necessarily decided the Club was entitled to no relief on any claim based on the validity of the order. We agree.

---

[7] The County contends the Club's overbreadth and related arguments lack merit because the Club's failure to obtain permits for the structures meant that it acquired no vested rights to construct any of them. (See *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 [132 Cal.Rptr. 386, 553 P.2d 546].) The County is correct in the law, but we do not read the Club's argument as a claim it had some vested right, but as a claim it is entitled to some form of equitable relief despite not having a vested right.

 The Club contends that even if the abatement order is affirmed, it may still be entitled to compensation on its claim for inverse condemnation on the theory the order has resulted in a taking. The flaw in this argument is that the complaint did not allege facts sufficient to support the conclusion abatement would result in a taking. " 'Regulations regarding and restrictions upon the use of property in an exercise of the police power for an authorized purpose, do not constitute the taking of property without compensation or give rise to constitutional cause for complaint.' " (*People ex rel. Dept. Pub. Wks. v. Adco Advertisers* (1973) 35 Cal.App.3d 507, 512 [110 Cal.Rptr. 849].) There is some authority for the proposition there may be a taking when a governmental authority adopts an ordinance severely restricting a landowner's use of its property even when the ordinance substantially advances legitimate government goals. (*McDougal v. County of Imperial* (9th Cir. 1991) 942 F.2d 668, 677–680.) The Club, however, cites no authority holding a landowner purchasing property subject to a restriction suffers a taking when the restriction is enforced.

The rule, albeit typically announced in a somewhat different context, is that for a taking to occur, there must be an invasion or an appropriation of some valuable property right which the landowner possesses. (*Selby, supra*, 10 Cal.3d at pp. 119–120.) The Club never had a property right to develop Golden Isle in violation of the County's land use requirements. It follows the Club's additional argument, that a determination of taking liability may not be determined by way of administrative mandamus (see *Healing v. California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1170 [27 Cal.Rptr.2d 758] (*Healing*)) also lacks merit. The issue in *Healing* was whether the California Coastal Commission's refusal to issue a permit so restricted the landowner's use as to effect a taking. (*Id.* at p. 1169.) That issue involved questions of fact, such as whether the landowner was deprived of all beneficial uses of the property or the degree of harm the planned use would cause to public lands and resources or adjacent private property. The court held such issues could not be determined on the limited administrative record before it. (*Id.* at pp. 1170–1175.) The issue here, in contrast, is whether the County has deprived the Club of some use of Golden Isle that existed when the Club purchased the island or was later conferred on the Club. There is no factual dispute on the point and therefore no need to consider anything beyond the administrative record.

 The Club's final contention is that its cause of action for violation of civil rights, asserted under title 42 United States Code section 1983 (section 1983), should not have been decided on demurrer. As relevant to the Club's appellate arguments, it alleged the County's actions violated the Club's federally protected rights and effected a taking. "A plaintiff seeking recovery under section 1983 must plead more than constitutional 'buzzwords' to

survive demurrer. [Citation.] The plaintiff must allege specific and nonconclusory facts showing the defendant's acts deprived him of a right, privilege or immunity secured by the federal Constitution or federal laws. [Citation.]" (*Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 180 [81 Cal.Rptr.2d 324] (*Breneric*).) " 'To state a due process cause of action under section 1983, a party must, as a threshold matter, allege a liberty or property interest within the protection of the Fourteenth Amendment. [Citation.] A property interest is defined as "a legitimate claim of entitlement to [a benefit]." [Citation.] Thus, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." [Citation.]' " (*Id.* at p. 181, citing *Blank v. Kirwan* (1985) 39 Cal.3d 311, 319 [216 Cal.Rptr. 718, 703 P.2d 58].) "[A] person cannot state a section 1983 claim absent a foundational showing that the government's action deprived him of a land use to which he was entitled." (*Breneric*, at p. 181.) For all the reasons we have expressed, the Club had no property interest allowing it to develop the island in violation of the County's land use requirements and zoning ordinances.

■ The Club also claimed, generally, a violation of equal protection, alleging the County had treated the Club differently than similarly situated property owners but had no compelling reason or rational basis for its disparate treatment. It did not allege additional necessary facts from which it might be concluded the asserted unequal treatment was the result of intentional discriminatory conduct, as opposed to mere laxity of enforcement. (See *Cilderman v. City of Los Angeles* (1998) 67 Cal.App.4th 1466, 1470 [80 Cal.Rptr.2d 20]; *Wade v. City and County of San Francisco* (1947) 82 Cal.App.2d 337, 339 [186 P.2d 181].) Moreover, a land use decision will survive an equal protection attack if it bears a rational relation to a legitimate governmental objective. (*Breneric, supra*, 69 Cal.App.4th at pp. 186–187.) Here, as in *Breneric*, the complaint itself shows the land use decision bears a rational relationship to a permissible governmental objective. In that case it was the rejection of a proposed development for transgressing aesthetic considerations. (*Id.* at p. 187.) Here it is the enforcement of land use restrictions adopted for the benefit of the public. As there, "[b]ecause the face of the complaint shows the decision bore a rational relationship to a legitimate state objective, the complaint does not allege facts sufficient to state a section 1983 claim for denial of equal protection." (*Ibid.*)

For all the reasons we have stated we find the claims set forth in the Club's complaint fail as a matter of law.

## CONCLUSION

We conclude the Club has no protectable property right or interest in its development on Golden Isle. We therefore affirm the order denying the petition for administrative writ of mandate. We further conclude the Club's complaint states no basis upon which the Club might be entitled to any relief. The judgment dismissing the complaint is affirmed.

Marchiano, P. J., and Margulies, J., concurred.