Filed 1/15/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| STEVEN DECEA, as Trustee, etc., <br><br> Appellant, <br><br> v. <br><br> COUNTY OF VENTURA, <br><br> Respondent. | 2d Civ. No. B302086 <br> (Super. Ct. No. 56-2018-00519378-CU-PT-VTA) <br> (Ventura County) |

Appellant bought a house in the Lake Sherwood community of Ventura County in 2007. The house sits within "Parcel A" on a map recorded by a former owner in 1974. The 1974 map also includes historical lot lines from a subdivision map recorded by the original developers in 1923. Parcel A overlays three of these historical lots and parts of two others. They total 1.04 acres.[1]

In 2017, appellant sought to reconfigure Parcel A into two half-acre lots. The plan stalled when the County Surveyor (the "County") told him Parcel A consisted of one legal lot, not five.

---

[1] A copy of the 1974 map is included here as Appendix 1.

This meant appellant could not subdivide the property without falling below the area's one-acre minimum lot size. Appellant disputed the validity of the 1974 parcel map and whether the former owner legally merged the five original lots into one. The County did not change its position.

Appellant sought relief by petitioning for "exclusion" under the Subdivision Map Act ("The Act"; Gov. Code, § 66410 et seq.).[2] He sought orders declaring the 1974 parcel map void and restoration of the historical lot lines. The trial court dismissed the petition based on the doctrine of laches and entered judgment without reaching Decea's legal arguments. We affirm.

FACTUAL BACKGROUND

Lake Sherwood is an unincorporated community in Ventura County surrounding a man-made eponymous reservoir.[3] A 1923 tract map ("1923 map") subdivided the area along Lake Sherwood's south shore into quarter-acre residential lots. Much of the surrounding land remained part of a large ranch property that passed through a succession of owners, including William Randolph Hearst, until the Murdock Development Company ("MDC") acquired it in the mid-1980s.

The late Jack Speirs bought one of the quarter-acre south shore lots in 1950. He expanded his property's footprint over the next two decades by acquiring adjacent properties as they came to market. This included lot numbers 62, 65, 66, 67, and part of

_____

[2] Unlabeled statutory references in this opinion are to the Government Code.

[3] The reservoir and surrounding woods were the location for the 1922 film, *Robin Hood,* as well as the more famous 1938 "Golden Age" iteration, *The Adventures of Robin Hood*; hence "Lake Sherwood."

68. Longtime neighbor William Dickerson bought lot 64 about the same time Speirs moved to the area. Together they purchased lot 63 to ensure it remained undeveloped, with each taking an undivided 50 percent interest.

Speirs hired Dennis Landberg to survey the properties he and Dickerson owned. Landberg submitted parcel map 17PM72 to the Ventura County Recorder in 1974 ("1974 map").[4] The 1974 map included the 1923 map's original lot lines but made two significant changes. First, it added a bold border around the outer boundaries of lots 65, 66, 67 and 68 and labeled them collectively as "Parcel A." Second, it split lot 63 into two pieces, with one piece going into Parcel A and the other grouped with Dickerson's lot 64 to form "Parcel B." Speirs's lot 62 remained separate from both Parcel A and B. The reasons Speirs prepared and recorded the 1974 map are unclear, though the record suggests he and Dickerson used the parcel map process to legally divide lot 63 without violating minimum lot size requirements.

The Legislature amended The Act several times over the next decade. Among these amendments were statutes permitting local agencies[5] to reduce housing density by merging lots

---

[4] An owner must record an approved parcel map to divide property and sell, lease, or finance the divided parcels. (See 7 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 20:10, pp. 42-43.) The Act currently limits the use of parcel maps to those subdivisions creating four or fewer lots. (§§ 66426, 66428, subd. (a).) Those creating five or more lots must proceed by tentative and final map. (§ 66426.)

[5] "Local agency" is defined as "a city, county or city and county." (§ 66420.)

3

considered too small for a neighborhood or zone. (§ 66451.10 et seq.) They could do so only after holding hearings at which affected owners could present evidence opposing merger. (§§ 66451.13, 66451.14, 66451.15.) Agencies could make a merger determination without hearing if the affected owners did not request one within 30 days of receiving notice. (§ 66451.17.)

These new merger laws were implicated when, in 1984, MDC informed the County of its plans to acquire and develop properties around Lake Sherwood. MDC and the County's Planning Division began preparing an area plan providing for high-end residences, a country club, a Jack Nicklaus-designed golf course, and substantial open space dedications.[6] The County sent merger notices to those who owned undeveloped lots falling below the one-acre minimum lot size.[7] Speirs learned the County planned to merge lot 62 into Dickerson's Parcel B.

Speirs appeared before County officials on June 26, 1985 and July 10, 1985 to discuss the proposed merger. He did not directly address whether the 1974 map effectuated a merger of lots 63, 65, 66, 67, and 68 into Parcel A. Rather, his discussion with officials focused on a lot line error he identified on the 1974 map near Parcel B.[8] He confirmed hiring Landberg to survey his

---

[6] The Board of Supervisors ultimately approved the Lake Sherwood/Hidden Valley Area Plan in 1987.

[7] An acre equals 43,560 square feet.

[8] Locating the errant lot line is difficult because we cannot see what Speirs pointed out on the 1974 map since only the audio recordings remain. The location of the error, however, neither informs nor affects this appeal.

4

property and Dickerson's but denied knowing about the error until he saw the map at the hearing. Speirs urged the County not to "kick [him] in the teeth" by using the incorrect lot line when they had discretion to fix the problem. A hearing official responded the County's "hands [were] tied" because the 1974 map was the official public record but encouraged him to contact Landberg about submitting a corrected map. Speirs took no further action.

Speirs passed away in 2002. His heirs sold Parcel A to John and Annette Matrisciano, who sold it to appellant Steven Decea ("Decea") in 2007.[9] Ten years later, Decea decided to subdivide Parcel A into two "buildable" half-acre lots. He began the process by requesting certificates of compliance for lots 63, 65, 66, 67, and 68 from the County in January of 2017. The County declined informing Decea that Parcel A was "a single discrete parcel" created by Speirs's 1974 map, not five as represented by Decea. This meant Decea could not subdivide the 1.04 acre property without running afoul of Lake Sherwood's one-acre lot size minimum.

PROCEDURAL HISTORY

Decea petitioned to exclude his property from the 1974 map in October of 2018. (§ 66499.21 et seq.) He sought an order voiding the map because Speirs and Dickerson did not consent to Dennis Landberg recording it in 1974. Decea claimed that even if the map were properly recorded, it would not erase the 1923 lots and merge them into Parcel A. His evidence included excerpts of

---

[9] Decea purchased the property, and later brought this action, in his capacity as Trustee of the Steven Decea 2005 Family Trust U.T.D. December 30, 2005.

audio recordings of John Speirs and County officials discussing the parcel map at two administrative hearings in 1985. Decea's petition cited frequently to the Sixth District's *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, one of the few authorities to explore The Act's merger provisions.

The County responded by objecting to the petition and asserting the 1974 map's validity. It pointed to parts of the hearing transcripts indicating Speirs knew officials considered Parcel A one legal lot yet failed to contest the interpretation. The County requested the court dismiss the petition under the doctrine of laches.[10]

The trial court issued a statement of decision dismissing the petition on the ground of laches. It did not address the substance of Decea's merger arguments under *van't Rood*. Decea appealed.

## DISCUSSION

*The Doctrine of Laches Applies to Petitions for Exclusion*

---

[10] The court did not expressly rule on the County's request to dismiss the petition as barred by Ventura County Ordinance Code section 66499.37's 90-day statute of limitations. This is of no consequence. The November 2, 2017 letter to Decea is not an "advisory agency" decision subject to this 90-day period. The County Surveyor is only one of three members of the advisory agency for hearings related to certificates of compliance. (Ven. County Ordinance Code, § 8201-6.1(d).) The letter does not refer to the agency or its other members. We granted the County's unopposed request for judicial notice of these ordinances and others relating to certificates of compliance in our order dated August 7, 2020. The Ventura County Board of Supervisors renumbered and revised many of its subdivision ordinances while this appeal was pending; we use the former numbers. (See Ventura County Ord. No. 4566, effective July 16, 2020.)

6

Exclusion is a procedure used to compel local authorities to redraw or discard a recorded subdivision map. (§ 66499.21 et seq.) A property owner initiates the procedure by filing a petition for exclusion with the local county surveyor and clerk of the board of supervisors. (§ 66499.22.) The petition must describe the property to be excluded and the reasons for requesting the remedy. (*Ibid*.) It must include a new map showing how the subdivision's boundary lines will change if the court grants the relief requested. (§ 66499.23.) The clerk then publishes a notice stating the nature of the petition and the deadline for filing objections. (§ 66499.24.) If the court receives objections it deems "material," it hears them first. (§ 66499.26.) If the court does not receive objections, it may proceed to hear the petition without further notice. (§ 66499.25.) A court presented with "satisfactory evidence of the necessity of the exclusion" may "order the alteration or vacation of the recorded map" and "enter its decree accordingly." (*Ibid*.)

Raising issues not argued below, Decea contends the equitable doctrine of laches cannot apply to his petition because the remedy of exclusion is statutory. Ordinarily, we decline to decide issues not raised below, but will do so where, as here, the issues are limited to questions of law. (*Xiloj-Itzep v. City of Agoura Hills* (1994) 24 Cal.App.4th 620, 633, quoting *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 ["'a change in theory is permitted on appeal when "a question of law only is presented on the facts appearing in the record"'"].)

Exclusion is a codified creature of equity resembling a mandatory injunction. (Civ. Code, § 3367, subd. (2) ["Specific relief is given: . . . [b]y compelling a party himself to do that which ought to be done"]; *Murphy v. Hopcroft*, (1904) 142 Cal. 43,

46 [subdivision (2) "is in accord with the fundamental rule of equity that its decrees operate upon the person and not upon the thing"].)  Decea did not seek monetary damages.  He sought to void an allegedly defective parcel and to compel the recording of his proposed alternative.  Applying the equitable doctrine of laches was appropriate considering he sought, and could receive, only equitable redress under The Act.  (See *Serra Canyon Co. v. California Coastal Com.* (2004) 120 Cal.App.4th 663, 667-668 [property owner barred by waiver from challenging Coastal Commission permit conditions due to "the inaction of its predecessor in interest"]; see also *G. R. Holcomb Estate Co. v. Burke* (1935) 4 Cal.2d 289, 300 [company's claim of equitable title in real property barred by laches because predecessor did not protest transfers of legal title that occurred many years earlier].)

Decea argues alternatively that even if laches were implicated, the "public policy exception" should prevent it from applying here.  We disagree.  This exception arises from a line of cases in which private litigants invoke the doctrine while defending government enforcement actions.  (See, e.g., *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 259, quoting *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493 ["'an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public"'"]; *In re Marriage of Lugo* (1985) 170 Cal.App.3d 427, 435, citing *City and County of San Francisco v. Pacello* (1978) 85 Cal.App.3d 637, 646 [laches "rarely invoked against a public entity to defeat a policy adopted for the protection of the public"].)  Applying the exception here would all but abrogate the doctrine in cases involving government entities as defendants.

8

*Substantial Evidence Supports the Trial Court's Laches Ruling*

Laches is an equitable defense available when a party unreasonably delays enforcing a right, and when granting the relief sought would prejudice the adverse party. (*In re Marriage of Fogarty & Rasbeary* (2000) 78 Cal.App.4th 1353, 1359.) The trial court found both delay and prejudice. We review the decision for substantial evidence. (See *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67, citing *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 ["Generally, a trial court's laches ruling will be sustained on appeal if there is substantial evidence to support the ruling"]; 1 MB Practice Guide: CA Civil Appeals and Writs 2.17 (2020), citing *Barickman v. Mercury Cas. Co.* (2016) 2 Cal.App.5th 508, 516 ["When the trial court's express factual basis for a decision is based upon the resolution of conflicts in the evidence, or on the factual inferences that may be drawn therefrom, reviewing courts consider the evidence in the light most favorable to the court's determination and review those aspects of the determination for substantial evidence"].)

The parties presented opposing arguments relying upon same evidence. Decea used the 1985 hearing transcripts as proof that Speirs doubted the map's validity. The County used them to show Speirs missed an opportunity to correct the map's flaws. The trial court considered the County's position more persuasive, finding a "reasonable person in the position of Mr. Speirs would have taken action if he or she wished to have the original lot lines restored." It noted it would be "patently unfair to rely upon indirect evidence that is subject to conflicting reasonable interpretations when direct evidence was once available and could have been provided in the absence of needless delay." We

9

agree with this assessment. The transcripts show Speirs struggling to recall events only 11 years earlier. Reconstructing the same events 44 years later without the live testimony of the original players would be all but impossible.

Substantial evidence supports the finding that Speirs knew the 1974 map contained at least one error he could fix by submitting a corrected parcel map. He did not. Admittedly, the error Speirs identified in 1985 was a single misplaced lot line. The hearings did not directly address the core issue of Decea's petition, i.e., whether the historical lots within Parcel A's boundaries legally merged into one under The Act. Speirs's dialogue with the County, though, shows he acknowledged the 1974 map's validity and knew what he had to do to correct any errors. The County heard no further from Speirs or his successors until Decea requested certificates of compliance in 2017.

As the trial court observed, the testimony of Speirs and his contemporaries "would have been highly probative" to the issues raised the petition. The loss of this testimony thus constituted substantial evidence of prejudice. (*Gerhard v. Stephens* (1968) 68 Cal.2d 864, 904, fn. 44 ["The loss of witnesses is a factor demonstrating prejudice [citations], and the cases do not require that defendant must demonstrate that their testimony would have been favorable to him"]; *Zakaessian v. Zakaessian* (1945) 70 Cal.App.2d 721, 727, citing *Austin v. Hallmark Oil Co.* (1943) 21 Cal.2d 718, 735 ["The death of a material witness is one factor in determining whether laches is present"].) We will not second guess the trier of fact where, as here, the evidence was susceptible to more than one reasonable factual conclusion. (See *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.)

10

CONCLUSION

We do not reach the issue of merger or the 1974 map's validity. The time to address the map's purported errors passed 35 years ago. It would be inequitable to awaken the issues now.

Judgment is affirmed. Respondent shall recover its costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

11

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Ferguson Case Orr Paterson, Wendy C. Lascher; Joshua M. Best, for Appellant.

Leroy Smith, County Counsel, and Eric Walts, Assistant County Counsel, for Respondent.

# APPENDIX 1
## Parcel Map recorded December 13, 1974



13