Filed 3/26/14 (Unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITY OF OAKLAND,<br><br>    Plaintiffs and Respondents.<br><br>    v.<br><br>OAKLAND POLICE AND FIRE<br>RETIREMENT SYSTEM et al.,<br><br>    Appellants and Respondents,<br><br><br>RETIRED OAKLAND POLICE<br>OFFICERS ASSOCIATION et al.,<br><br>    Appellants and Interveners. | A136769<br><br>(Alameda County<br>Super. Ct. No. RG11580626)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

It is ordered that the opinion filed February 28, 2014, be modified as follows:

1. The section heading on page 31 which currently reads "**C. Equitable Defenses**" is corrected to read "**D. Equitable Defenses**."

2. Footnote 18 will be added to the end of the last paragraph of section II.D.1. on page 40, after the last sentence ending "compensation attached to rank." [1]

---

[1] In *Crumpler, supra,* 32 Cal.App.3d 567, the executive officer of the PERS board determined that certain PERS members had been improperly classified years earlier and reclassified them. The reclassified members asked for an administrative hearing and, following that hearing, the PERS board determined that retroactive reclassification to their dates of hire was appropriate. (*Id.* at pp. 570-571.) The reclassified members then sought a writ of mandate to review and set aside the decision of the PERS board, and the trial court granted the writ. (*Id.* at p. 571.) On appeal, the *Crumpler* court concluded that the PERS board was estopped from reclassifying the PERS members prior to the date of the board's reclassification decision, but could reclassify them prospectively. (*Id.* at

1

3. All subsequent footnotes will be renumbered.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

 

 

_____
REARDON, ACTING P. J.

We concur:

_____
RIVERA, J.

_____
HUMES, J.

---

p. 584-586; see also Gov. Code, § 20160, subd. (e) [correction of PERS benefit errors shall take place "as of the time that the correction actually takes place" when the purposes of PERS "will not be effectuated if the correction is performed in a retroactive manner"].) Thus, the court declined to end the estoppel on the date that PERS first indicated its change of position through its executive officer, or at any other point prior to the PERS board's formal determination that an error had occurred. In the present case, the record is clear that the Board did not consider the issue of shift differential pay prior to the commencement of these proceedings. Under these circumstances, we conclude that estoppel in this case is appropriate for all payments made prior to the date that our decision in this matter becomes final. (Compare *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [holding that decision overruling prior case law will be applied prospectively from the date that the decision becomes final based on notions of fairness and given reliance on the previous precedent].)

2

Trial Court:                                    Alameda County Superior Court

Trial Judge:                                    Hon. Evilio M. Grillo

Counsel for Plaintiff and Respondent:          Nossaman LLP
                                                Stephen N. Roberts
                                                James H. Vorhis

Counsel for Appellants:                         Olson Hagel & Fishburn
                                                Richard C. Miadich

Counsel for Intervenors:                        Davis, Cowell & Bowe, LLP
                                                W. David Holsberry
                                                Sarah Grossman-Swenson

Filed 2/28/14 (Unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITY OF OAKLAND,<br><br>    Plaintiffs and Respondents.<br><br>    v.<br><br>OAKLAND POLICE AND FIRE RETIREMENT SYSTEM et al.,<br><br>    Appellants and Respondents,<br><br>RETIRED OAKLAND POLICE OFFICERS ASSOCIATION et al.,<br><br>    Appellants and Interveners. | A136769<br><br>(Alameda County<br>Super. Ct. No. RG11580626) |

In this appeal, we revisit the provisions of the Oakland City Charter that determine how retirement benefits are calculated for members of the Oakland Police and Fire Retirement System (PFRS). The Retired Oakland Police Officers Association, along with several PFRS's members and beneficiaries (collectively, the "Association"), appeal from a judgment granting a peremptory writ of mandate and declaratory relief in favor of the City of Oakland (City). In the trial court, the City successfully argued that the Oakland Police and Fire Retirement Board (Board) had impermissibly included certain holiday premium pay and shift differential pay in the calculation of PFRS retirement

1

benefits. The Board was ordered to correct its calculations for all future payments and to implement a plan for recovering past overpayments made to retirees.[1]

# I. BACKGROUND

## A. *The Oakland Police and Fire Retirement System (PFRS)*

PFRS was created in 1951 when separate police and fire retirement systems were merged pursuant to article XXVI of the Oakland City Charter (Charter). (Charter, art. XXVI, § 2600.) Only members of the Oakland Police Department (Department) or Oakland Fire Department hired prior to July 1, 1976, are eligible for coverage by PFRS.[2] (*Id*., §§ 2600, 2607.) Current members of the Department (except for one sergeant covered by PFRS who has not yet retired) are included in the state-created Public Employees' Retirement System (PERS). Thus, PFRS is essentially a closed system with a dwindling pool of retirees. As of January 31, 2012, PFRS had 619 retired police members and widows, with an average age of 73.

PFRS is funded through a combination of member contributions (reportedly between 5 and 13 percent of each member paycheck), investment returns and additional monies supplied by the City "as may be necessary." (*Id.*, §§ 2601, subd. (e), 2619.) Its governing Board consists of seven members, including representatives of the City, the Department, the Fire Department and the PFRS retirees, as well as a local life insurance executive, a banker and a community representative. (*Id*., § 2601.) Pursuant to the terms of the Charter, PFRS is managed and administered by the Board, which has "exclusive control of the administration and investment" of all PFRS funds. (*Ibid*.)

---

[1] Initially, an appeal was also filed in this case by PFRS and the Board, arguing only that the City had failed to exhaust its administrative remedies. However, after the filing of their opening brief, both PFRS and the Board requested that this Court dismiss their appeal because they had reached a settlement with the City. Over the objection of the Association, we granted the dismissal request. As the Association has also raised the exhaustion issue, we will consider it in the context of this appeal.

[2] The Department refers to sworn peace officers of all ranks as "members" of the Department. Non-sworn civilian employees of the Department are called "employees." We adopt this nomenclature here.

In a fixed pension system, benefits are paid to a retiree based on the compensation paid to that retiree for a defined period of time prior to retirement. (*Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 48, fn. 1 (*Kreeft*), citing *Dunham v. City of Berkeley* (1970) 7 Cal.App.3d 508, 511, fn.1 (*Dunham*).) PFRS, in contrast, is a "fluctuating" system under which pension benefits paid to retired members increase or decrease over time as the compensation paid to active members of the Department similarly rises or falls. (*Kreeft*, *supra*, 68 Cal.App.4th at p. 48; see also *Dunham, supra,* 7 Cal.App.3d at p. 511.) The primary purpose of a fluctuating pension plan such as PFRS "is to guarantee the pensioner a fairly constant standard of living despite inflation, and to maintain equality of position between the retired member and the person (or persons) currently holding the rank the pensioner attained before his retirement." (*Kreeft, supra,* 68 Cal.App.4th at p. 54.) Thus, a PFRS retiree receives benefits based on the compensation currently paid to active sworn personnel who hold the rank that the member held prior to retirement. Stated in terms of the applicable Charter language, the retiree receives benefits based on the current compensation that is "attached to the average rank held" by that retiree in the three years prior to retirement.[3] This appeal involves the inclusion of certain holiday premium pay and shift differential pay as "compensation attached to rank" for purposes of calculating PRFS retirement benefits.

---

[3] Specifically, section 2607 of the Charter defines " '[c]ompensation attached to the average rank held' " as "the compensation attached to the lowest rank held during the three years immediately preceding retirement plus one thirty-sixth (1/36) of the difference between it and the compensation attached to any higher rank held during that period of each month, and fraction thereof, the higher rank was held."

" 'Compensation' " is defined by section 2607 to mean "the monthly remuneration payable in cash, by the City, without deduction, for time during which the individual receiving such remuneration is a member of the Police or Fire Department, but excluding remuneration paid for overtime . . . ."

**B.** *The Disputed PFRS Payments*

    *1.* *Holiday Premium Pay*

Although the relevant provisions of the Charter with respect to the calculation of pension benefits based on "compensation attached to rank" have not changed over the years, the application of that Charter language in the context of holiday premium pay has not been similarly static. Indeed, there is a long and storied history to the holiday pay issue, involving multiple lawsuits, stipulated settlements, and numerous changes to the various memoranda of understanding (MOU's) governing the City's holiday compensation obligations with respect to active members of the Department. While the City attempts to limit the discussion in this case to the current MOU's provisions authorizing holiday pay, we find the history instructive and therefore summarize it here.

Before we begin, however, we note that discussion and analysis of the holiday pay issue has been clouded in the past by failure to define the terms "holiday pay" and "holiday premium pay" in a precise manner. For purposes of this opinion, we will use the two terms interchangeably to refer to that pay *in excess of* the regular or base pay to which a member of the Department may be entitled due to the occurrence of a holiday. Thus, holiday pay includes the *extra* compensation payable to a police officer who works on a holiday (over and above base pay), as well as the compensation due to an officer who has a regular day off or takes vacation on a holiday and therefore does not work.

The question of whether holiday pay is "compensation attached to rank" for purposes of calculating PFRS retirement benefits was first addressed by Division Four of the First Appellate District in 1971 in the case of *Buck v. City of Oakland* (August 25, 1971, 1 Civ. 28402) [nonpub. opn.] (*Buck*). When *Buck* was decided, the compensation payable to active members of the Department was set by salary ordinance. (See Oakland Ord. No. 4817, amending section 1.19 of Oakland Ord. No. 4727 (the 1971 Ordinance).) With respect to holiday pay, the 1971 Ordinance provided in relevant part: "Time worked by any officer or member of the Police Department . . . in excess of 40 hours during any one-week period shall be deemed overtime work; provided, however, that . . . whenever any legal holiday, as herein designated, shall fall within any such one-week period, the

4

said officer or member of the Police Department shall be credited with 8 hours of work in computing said 40 hours during said one-week period." (*Ibid.*) The 1971 Ordinance, which designated 11 holidays, maintained that "[s]uch extra compensation shall not be construed to increase pensions paid from the Police and Fire Retirement Fund, nor deductions for contributions thereto." (*Ibid.*)

In *Buck*, active and retired members of the Department sought a writ of mandate to compel the City and the Board to include the value of certain fringe benefits paid to active members—including holiday pay—as "compensation attached to rank" for purposes of calculating PFRS retirement benefits. (*Buck, supra,* 1 Civ. 28402 at pp. 1-3.) After reviewing the provisions of the Charter set forth above which define "compensation" and "compensation attached to the average rank held," the court first concluded that the express provision in the 1971 Ordinance attempting to exclude holiday pay from retirees' pensions was not controlling. (*Id.* at pp. 2-5 [effectuating such a provision would permit the City to amend the Charter by ordinance which cannot be done].) The court went on to determine that remuneration for holiday work did not constitute overtime and therefore was not excluded from the Charter's definition of "compensation." (*Id.* at pp. 11-12; see also Charter, art. XXVI, § 2607 [" 'compensation' " defined as monthly remuneration excluding overtime].) Finally, the court opined that the eight hours credited to a police officer who worked on a holiday was most often paid to that officer in cash and was therefore " 'extra compensation' [citation] for having worked on a 'legal holiday.' [Citation.]" (*Buck, supra,* 1 Civ. 28402 at p. 12.) As such, it was "compensation" for purposes of the Charter and "must be included in the computation of retirement allowances." (*Ibid.*)

In the wake of *Buck,* the City reportedly tried to avoid the inclusion of holiday pay in PFRS retirement benefits by altering the holiday pay structure for active members of the Department. Specifically, the Department began giving active officers compensatory time off in lieu of actual holiday pay. In response to this change, lawsuits were filed and eventually the City was permanently enjoined from enforcing any "ordinance, resolution or directive which decreases or attempts to decrease the holiday pay . . . received by

5

Oakland police officers or firemen as 'monthly compensation comprising salary.' "
(*Doan v. City of Oakland* (Super. Ct. Alameda County, 1972, No. 426926) (*Doan*).) In addition, the City was ordered to pay active members retroactively for any lost holiday pay and was directed "to pay the increased retirement allowances based thereon pursuant to the [*Buck*] decision." (*Ibid.*)

The City and the Oakland Police Officer's Association (OPOA) adopted the first MOU setting Department compensation in 1973 after the *Doan* decision. As part of the 1973 MOU, the City agreed not to appeal the decision in *Doan* and to comply with the terms of the permanent injunction, including the "computation of retirement benefits under the Buck Decision" with respect to holiday pay. In 1974, a more comprehensive MOU was adopted which designated 11 holidays and indicated that premium pay for holidays was to be "computed at the regular hourly base rate of pay for an employee's classification, rather than at the [overtime] rate of time and one-half." Thus, as in *Buck*, members of the Department received eight hours of holiday premium pay. Similar language was carried over into the 1975 MOU. During this timeframe, the extra eight hours of compensation received by members of the Department as holiday premium pay was included in the calculation of PFRS retirement benefits.

In 1976, the City and OPOA adopted an MOU increasing holiday premium pay from the straight-time rate (8 hours) to a rate based on "time and one-half the regular base rate of pay for an employee's classification" (12 hours). The 1976 MOU, however, contained the following language impacting the calculation of PFRS retirement benefits: "City and [OPOA] agree that premium pay shall not be subject to retirement except for the straight time portion of holiday pay." Although the record does not contain MOU's covering the period from 1988 through 1994, it appears that similar limiting language continued from 1976 up through the 1995-1998 MOU. Based on the language of the MOU's, PFRS retirees only received credit for 8 hours of holiday premium pay in the calculation of their retirement benefits from 1976 through 1996. In contrast, active members of the Department received 12 hours of holiday pay during this same period. At some point between 1986 and 1995, the number of paid holidays increased from 11 to 12.

6

Holiday premium pay was again the subject of litigation in 1996. (See *Oakland Police & Fire Retirement Assn. v. City of Oakland* (Super. Ct. Alameda County, 1996, No. 763859) (*Arca II*).) *Arca II* was a class action lawsuit filed on behalf of PFRS retirees and their beneficiaries challenging the MOU language that excluded retirees from receiving credit for the additional four hours of holiday pay that was being paid to active members of the Department. In that case, the City did not contest the holding in *Buck*, but argued that the additional four hours of holiday pay was "overtime" pay and therefore expressly excluded from the calculation of PFRS retirement benefits. (See Charter, art. XVI, § 2607 [" 'compensation' " defined as monthly remuneration excluding overtime].) The trial court disagreed, granting a writ of mandate in favor of PFRS retirees with the following instructions: "Respondents are compelled in determining and computing the amount of the retirement allowances due to Petitioners and the class they seek to represent to take all actions necessary to *include as 'compensation' and 'compensation attached to the average rank held' the full twelve hours holiday pay received by current Oakland Police Officers*" (italics added). The City was further ordered to make three years of retroactive retirement allowance payments with interest. Subsequently, the parties entered into a settlement agreement in which the City agreed not to appeal *Arca II*, to follow the terms of the decision, and to make the required retroactive payments. In return, the City received a reduction in the interest otherwise payable to PFRS retirees pursuant to the decision.

In accordance with *Arca II* and the related settlement agreement, the 1998-2001 MOU between the City and OPOA deleted the language limiting holiday pay for PFRS retirees, stating simply that premium pay for holidays would be "computed at time and one-half the regular base rate of pay for an employee's classification." Identical language appeared in the 2001-2006 MOU. In practice, however, the application of holiday premium pay to the various shifts worked by active members of the Department was becoming more complex. In 2000, the Department issued Departmental General Order 8 (DGO 8) interpreting the MOU provisions in light of these changes. Pursuant to DGO 8, a member that took holiday time off was paid at the straight-time rate of 8 or 10

7

hours, depending on the length of that member's usual shift. A member of the Department who worked on a holiday received regular base pay (of either 8 or 10 hours) plus 1.5 times that base pay in holiday premium pay. When a holiday fell on a member's regular day off, that member was allotted 12 hours of holiday pay, regardless of whether he/she usually worked an 8 or 10-hour shift. Finally, a member who was required to work on a holiday that was his/her regular day off was granted 12 hours in base pay, plus 1.5 times base pay in holiday premium pay. Thus, while all members were entitled to holiday pay for each holiday, the amount actually received on a particular holiday varied from 8 to 18 hours, depending on scheduling and length of shift. During this same time period, PFRS retirees continued to receive credit for 12 hours of holiday pay for each holiday in accordance with the terms of *Arca II*.

Upon expiration of the 2001-2006 MOU, the City and OPOA reached an impasse in negotiations and thus the terms of the successor MOU were determined through an arbitration process conducted by Arbitrator Barry Winograd. The resulting 2006-2010 MOU states expressly that it was entered into pursuant to the terms of this arbitration decision and award, which is attached to the MOU and incorporated as Appendix A (Winograd Decision). With respect to holiday pay, the 2006-2010 MOU designated 12 holidays and one "floating" holiday and provided for base pay for any regularly scheduled shift worked on a designated holiday. In addition: "[I]f the holiday is worked, the employee shall be paid for all hours worked at the overtime rate of time and one-half (1.5). If the holiday is not worked because of a regular day off, or by employer request, employee will be paid holiday pay at the straight time rate." The Winograd Decision did not alter the holiday pay structure set forth in the body of the MOU and—with respect to the number of designated holidays —stated simply "[s]tatus quo."

As a result of additional negotiations between the City and OPOA, the 2006-2010 MOU was subsequently extended into 2013. This amended and extended MOU temporarily changed the structure of holiday pay for active members of the Department. Specifically, for the 2009, 2010, and 2011 fiscal years, only seven of the regular holidays were paid in accordance with the customary policy established by the MOU. For the

8

other six holidays, active members received no holiday pay for holidays that were not worked and "straight time pay" for holidays that were worked. Currently, holiday pay for active members of the Department is governed by the 2006-2013 MOU, which has been extended a second time into 2015. No additional changes have been made with respect to the provisions governing holiday premium pay except that, for the 2012, 2013, and 2014 fiscal years, active members are not entitled to any holiday pay for Admission Day. Members who work on Admission Day will still receive their regular base pay for that shift.

       2.     *Shift Differential Pay*

In contrast to holiday premium pay, the inclusion of shift differential pay in the calculation of PFRS retirement benefits is of fairly recent origin. Prior to the 2001-2006 MOU, active members of the Department in the patrol division received a type of premium pay called "line-up pay," which was 30 minutes of extra compensation for the organizational meeting that occurred prior to the beginning of a shift. The 1974 MOU (and all subsequent MOU's contained in the record through 1998) states that "[c]ompensation for . . . Patrol Division line-up time shall be computed at the regular hourly base rate of pay for an employee's classification . . . ." The 1998-2001 MOU modified this arrangement for certain shifts, stating: "For members working the first and second watches, line-up shall be accomplished during the regular ten hour shift and such members shall not receive line-up pay. For members working the third watch and for members working a five day, eight hour schedule in Patrol, line up time shall be computed at the regular hourly base rate of pay for an employee's classification . . . ." Thereafter, in the 2001-2006 MOU, line-up pay was completely abolished. Pursuant to a 1984 superior court decision, line-up pay had been declared to be compensation for purposes of the calculation of PFRS retirement benefits. (*Arca v. City of Oakland* (Super. Ct. Alameda County, 1984, No. 579832-8) (*Arca I*).) Under the terms of *Arca I*, any PFRS retiree who had been assigned to patrol or traffic at any time during the final three years of employment was given credit for "the amount of line-up pay received by active police officers similarly assigned." (*Ibid.*)

9

Although it eliminated line-up pay, the 2001-2006 MOU added shift differential pay as a form of premium pay "for certain hard-to-fill shifts on swing and night shift in order to encourage more experienced officers to take night shifts." Pursuant to both the 2001-2006 MOU and the 2006-2015 MOU, a member assigned to a work unit (other than traffic or vice/narcotics) "that requires a regular work schedule with late evening and/or early morning hours or to an assignment with a flexible hours schedule," may be eligible for shift differential pay of between 6.25 percent and 8.25 percent. In a letter sent to PFRS retirees dated March 27, 2002, the City indicated that shift differential pay at a rate of 7.25 percent (an agreed-upon composite rate) had replaced line-up pay and would be included in the calculation of retirement benefits as of April 1, 2002, for PFRS retirees who had previously received line-up pay.

## C.    *Proceedings Before the Board*

On February 24, 2010, the City and the Association appeared before the Board to discuss the temporary reduction in holidays implemented by the 2006-2013 MOU for active members of the Department. Specifically, pursuant to the terms of the MOU, the Chief of Police was required to designate six holidays for each of fiscal years 2009-2010, 2010-2011, and 2011-2012 that would be unpaid. The City argued before the Board that this temporary reduction should be reflected in the calculation of PFRS retirement benefits for the years affected. [4]

The Association, in contrast, argued that no reduction was required. Specifically, it contended that the 2006-2013 MOU contained conflicting provisions with respect to the number of designated holidays because the Winograd Decision—which was attached and incorporated into the extended MOU—stated that the number of holidays was "status quo," while the three-year reduction in the number of holidays was contained in the revised body of the MOU. According to the Association, this conflict should be resolved

---

[4] Apparently, as one of the six unpaid holidays, the Chief designated the "floating holiday" which is granted annually to members of the Department, but has never been included as a designated holiday in the calculation of PFRS benefits. Thus, the City was arguing for a reduction in the number of paid holidays credited to retirees from 12 to 7.

10

in the way most beneficial to PFRS retirees. At the conclusion of the hearing, the Board adopted a resolution endorsing the Association's position and concluding that the temporary reduction in the number of paid holidays for active members of the Department would not be reflected in retiree benefits.

Thereafter, in October 2010, the City informed the Board by letter that PFRS retirees were being overpaid for holidays under the current MOU because they were receiving credit for holiday premium pay at the rate of time and one-half, rather than straight time holiday pay. The City indicated that it intended to exclude the holiday premium pay from retiree benefits as of January 1, 2011, and requested the Board's assistance in determining how best to recover past overpayments. After the Board responded challenging the City's authority to alter the benefits payable to PFRS retirees on a unilateral basis, the City agreed to delay any benefit reduction pending a hearing on the matter before the Board.

Proceedings before the Board with respect to the holiday premium pay issue were held on November 17, 2010, and January 26, 2011. At those hearings, the City argued that the 2006-2010 MOU altered the way that active members of the Department are compensated for holidays by making a distinction between members who work on the holiday (and receive holiday premium pay at a rate of time and one-half) and members who do not work on the holiday (and receive holiday premium pay at a straight time rate). The City claimed that pension benefits should only reflect straight time pay for holidays because retirees, by definition, do not work.[5] According to the City, to conclude otherwise would constitute a gift of public funds and represent the unlawful expansion by the Board of pension benefits beyond those specifically authorized by the Charter. The

_____

[5] There is some indication that the City was taking the position before the Board that retirees should be entitled to nothing other than base pay with respect to holidays—that is, that they should be treated as if they took each holiday off with pay and thus should be given credit only for their customary monthly salary. However, the 2006-2010 MOU authorizes holiday premium pay at a straight time rate when a holiday falls on a member's regular day off. Under that scenario, the member would be entitled to the holiday pay at the straight time rate *in addition to* his/her usual base compensation.

City asked for prospective relief and for retroactive relief from the date of the Winograd Decision (March 11, 2008), which had finalized the terms of the 2006-2010 MOU.

The Association, unsurprisingly, disagreed with the City's analysis. After recounting the extensive history of the holiday pay issue summarized above, it noted that police departments must be adequately staffed around the clock for public safety reasons. Consequently, unlike most other employees, police officers work on holidays as a matter of course and the extra pay associated with working on holidays becomes part of a police officer's basic monthly compensation package. The Association therefore argued that the First District's conclusion in *Buck*—that extra compensation paid for working on a holiday is "compensation attached to rank"—was correct and should be controlling. As a consequence, PFRS retirees were being properly compensated by receiving credit for holiday premium pay as if they had actually worked the holiday.

The Board continued the matter so that it could receive and consider an opinion from its attorney on the holiday pay issue. In a letter dated February 16, 2011, the Board's counsel opined that the holiday pay language in the 2006-2010 MOU did not constitute a change, but was instead merely a clarification of longstanding practice. Counsel further stated that—even if a change in compensation for active members had occurred—it was irrelevant since the *Buck* case had concluded that the extra compensation paid to active police officers for actually working a holiday constitutes "compensation attached to rank" for retirement purposes despite the fact that retirees, obviously, do not work on holidays. Finally, the Board's attorney noted that treating holiday premium pay earned for working a holiday as "compensation attached to rank" is consistent with the underlying purposes of a fluctuating pension system like PFRS: Since active police officers routinely work holidays and historically have received holiday premium pay for such work, including this extra compensation in the calculation of PFRS benefits would maintain equality of position between active and retired members of the Department. After considering all of the information before it, the Board concluded that no overpayment to PFRS retirees had occurred.

As stated above, the new benefit of shift differential pay was made available to active members of the Department as part of the 2001-2006 MOU. However, no hearings were ever held before the Board with respect to the inclusion of shift differential pay as part of "compensation attached to rank." Rather, shift differential pay was included in the calculation of benefits for those retirees who had previously received line-up pay in accordance with the City's letter of March 27, 2002.

## D.     *Proceedings in the Trial Court*

On June 14, 2011, the City filed a petition for writ of mandate and complaint for declaratory relief against PFRS and the Board in Alameda County Superior Court. In its papers, the City claimed that the Board was overcompensating PFRS retirees in four specific ways: (1) by paying retirees at an excessive rate for holidays; (2) by paying retirees for too many holidays; (3) by including shift differential pay in the calculation of retiree benefits; and (4) by paying retirees who retired above the rank of Captain at an excessive rate for holidays.[6] The City characterized these errors as "ministerial" and requested a writ of mandate compelling the Board to cease all such overpayments on a prospective basis. In addition, the City sought retroactive relief, including a determination regarding the proper manner for recovering overpayments made to PFRS retirees.

PFRS and the Board filed their answer on August 1, 2011, disputing all of the City's overpayment claims. On August 24, 2011, the trial court granted the Association leave to intervene, and on August 29, 2011, the Association filed its Complaint in Intervention, joining PFRS and the Board in contesting the City's allegations. Evidence and argument were provided to the trial court largely in the form of declarations and briefing, although the trial court did hold oral argument on May 2, 2012, and June 1, 2012, in connection with the publication of its tentative decision.

---

[6] The City did not press this final issue in the trial court—that retirees who retired above the rank of Captain are being overpaid for holidays—and the trial judge did not rule on it. We therefore do not consider it here.

13

On August 10, 2012, the trial court issued its order granting the City's petition for a writ of mandate and adjudicating the City's request for declaratory relief in the City's favor. The trial court's conclusions were based largely on its analysis of the First District's opinion in *Kreeft, supra,* 68 Cal.App.4th at p. 46, which considered the Charter provision involving " 'compensation attached to the rank' " in the context of certain overtime pay authorized by the federal Fair Labor Standards Act (FLSA). Based on its reading of *Kreeft*, the trial court held that holiday pay at the rate of time and one-half payable to active members of the Department for working on holidays was not " 'compensation attached to the rank' " for purposes of calculating PFRS retirement benefits. Rather, PFRS retirees were entitled to credit only for the straight-time holiday pay authorized for active members regardless of whether a holiday is actually worked. The trial court further determined, based on the express language of the 2006-2013 MOU, that PFRS retirees should only have been credited for seven holidays during the three fiscal years (2009-2010, 2010-2011, and 2011-2012) in which active members of the Department received similarly reduced holiday pay. With respect to shift differential pay, the trial court resolved that such pay was also not " 'compensation attached to the rank' " and should not be used in calculating PFRS benefits. The trial court ordered prospective relief and directed the Board to collect any overpayments, subject to the applicable statute of limitations. Judgment was entered on September 7, 2012, and this timely appeal followed.

## II. DISCUSSION

### A.   *Standards of Review*

The trial court properly determined that ordinary mandamus pursuant to section 1085 of the Code of Civil Procedure is the appropriate procedural mechanism for resolving the dispute in this case. (*Kreeft, supra,* 68 Cal.App.4th at pp. 52-53.) "In reviewing a trial court's judgment on a petition for writ of ordinary mandate, we apply the substantial evidence test to the trial court's factual findings. However, we exercise our independent judgment on legal issues, such as the interpretation of statutory retirement provisions." (*Id.* at p. 53; see also *Lindelli v. Town of San Anselmo* (2003) 111

14

Cal.App.4th 1099, 1104 (*Lindelli*).)  Similar standards apply when we consider whether a determination is proper in an action for declaratory relief. (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366 [review of declaratory relief is generally for abuse of discretion; however, when facts are undisputed and issue is one of statutory interpretation, independent judgment/de novo review appropriate].)[7]

Given the factual posture of this case, we are also mindful of several additional precepts which guide our review.  First, it is well settled that pension provisions must be "liberally construed" in favor of pensioners.  (*Dunham, supra,* 7 Cal.App.3d at p. 513.)  Further, pursuant to article XVI of the California Constitution, the duty of a public retirement board "to its participants and their beneficiaries shall take precedence over any other duty," including minimizing employer contributions and defraying administrative costs.  (Cal. Const., art. XVI, § 17, subd. (b).)[8]  In addition, "[a] retired employee has a contractual right, protected by constitutional guarantees, in a pension," and such benefits

---

[7] Appellants argue at length that the trial court in this case failed to apply an appropriately deferential standard of review to the Board's calculation of retirement benefits.  However, we will resolve this appeal through our de novo review of legal issues, such as the interpretation of the Charter.  "Consequently, we are to exercise our own independent judgment in reviewing the matter, unfettered by any conclusions reached by the trial court, and any errors committed by the trial court with respect to the proper standard of review will be cured by our independent analysis of the issues." (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1289 (*City of Coachella*); see also *Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, 578 ["[t]he ultimate interpretation of a statute is of course an exercise of judicial power and it is the responsibility of the courts to declare its true meaning even if it requires rejection of an earlier erroneous administrative interpretation"] (*Crumpler*); cf. *Yamaha Corp. of America v. State Bd.of Equalization* (1998) 19 Cal.4th 1, 11-12 [discussing difference between review of an agency's quasi-legislative rulemaking and it's interpretation of a statute].)

[8] This State constitutional provision was reportedly put in place in 1992 through Proposition 162 (The California Pension Protection Act of 1992) to "insulate the administration of retirement systems from oversight and control by legislative and executive authorities" (*Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1192), and to protect retirement boards from "political meddling and intimidation" (*Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1101-1102 & fn. 8 [quoting measure's "Findings and Declarations"]).

"may not be changed to [that employee's] detriment." (*Dunham, supra,* 7 Cal.App.3d at p. 513.) In the context of a fluctuating pension plan such as PFRS, however, it must be emphasized that specific plan benefits are not static, but are instead subject to revision where necessary to maintain equality of position between the retired member and the members currently holding the rank the pensioner attained before retirement. (See *Kreeft, supra,* 68 Cal.App.4th at p. 54.)

**B.      *Holiday Premium Pay***

As stated above, the trial court in this case determined that the time and one-half holiday pay which active members of the Department receive for working on holidays is not "compensation attached to rank" for purposes of the calculation of PFRS retirement benefits. Relying on the First District's decision in *Kreeft*, the trial court concluded that PFRS retirees should only be credited with straight-time premium pay for holidays. The Association challenges the trial court's holiday pay ruling on a number of grounds. It asserts, for instance, that prior court decisions by the First District in *Buck* and by the Alameda County Superior Court in *Arca II* are res judicata, barring the City from re-litigating the issue of holiday pay. The trial court summarily dismissed the doctrine of res judicata, remarking simply that *Buck* and *Arca II* concerned retiree rights when compensation for active members of the Department was "set by different MOUs." We, in contrast, find the doctrine dispositive.

The tenets of res judicata prescribe the preclusive effect of a prior, final judgment on the merits. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 (*Mycogen*).) The doctrine has two distinct aspects: claim preclusion and issue preclusion. (*Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319, 1326 (*Alpha Mechanical*).) Claim preclusion, often referred to as res judicata, provides that "a valid, final judgment on the merits precludes parties or their privies from relitigating the same 'cause of action' in a subsequent suit." (*Le Parc Community Assn. v. Workers' Comp. Appeals Bd.* (2003) 110 Cal.App.4th 1161, 1169 (*Le Parc*).) Issue preclusion, or collateral estoppel, " 'precludes relitigation of issues argued and decided in prior proceedings.' " (*Mycogen, supra,* 28

16

Cal.4th at p. 896, quoting *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) Application of the doctrine of res judicata "is intended to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 829.) It "rests upon the sound policy of limiting litigation by preventing a party who has had one fair adversary hearing on an issue from again drawing it into controversy and subjecting the other party to further expense in its reexamination." (*In re Crow* (1971) 4 Cal.3d 613, 622-623; see also *Alpha Mechanical, supra,* 133 Cal.App.4th at p. 1327.) Whether the doctrine of res judicata applies in a particular case is a question of law which we review de novo. (*Noble v. Draper* (2008) 160 Cal.App.4th 1, 10.)

With respect to claim preclusion (res judicata), three requirements must be met. First, the second lawsuit must involve the same " 'cause of action' " as the first lawsuit. Second, there must have been a final judgment on the merits in the prior litigation. Third, the parties in the second lawsuit must be the same (or in privity with) the parties to the first lawsuit. (*Le Parc, supra,* 110 Cal.App.4th at p. 1169.) Under the present facts, the City, the Board and the PFRS retirees were all parties in *Buck,* and the First District's unpublished decision in that case constitutes a final judgment on the merits. Thus, the only remaining question is whether this case involves the same "cause of action" as *Buck*.[9]

Whether two lawsuits are based on the same cause of action is determined in California by reference to the primary right theory. (*Mycogen, supra,* 28 Cal.4th at p. 904.) Under this theory, a "cause of action" is comprised of a primary right possessed by the plaintiff, a corresponding duty imposed upon the defendant, and a wrong done by the defendant which is a breach of such primary right and duty. (*Balasubramanian v.*

---

[9] The Association also argues that the Alameda County Superior Court's decision in *Arca II* should be deemed res judicata on the issue of holiday pay. However, the single paragraph decision in that case—while it certainly indicates that PFRS retirees are entitled to credit for the full 12 hours of holiday pay earned by active members of the Department—does not speak in terms of holiday pay received for actually working on a holiday. We therefore focus our discussion on the preclusive impact of *Buck*.

17

*San Diego Community College Dist.* (2000) 80 Cal.App.4th 977, 991 (*Balasubramanian*).) The primary right is the plaintiff's right to be free of the particular injury, regardless of the legal theory on which liability is premised or the remedy which is sought. (*Mycogen, supra,* 28 Cal.4th at p. 904; accord *Estate of Dido* (2011) 198 Cal.App.4th 791, 801.) Thus, it is the *harm suffered* that is the significant factor in defining the primary right at issue. (*Alpha Mechanical, supra,* 133 Cal.App.4th at p. 1327; *Balasubramanian, supra,* 80 Cal.App.4th at p. 992; *Craig v. County of Los Angeles* (1990) 221 Cal.App.3d 1294, 1301.)

Applying these principles in the present case, it is clear that the harm suffered by PFRS retirees which led to the First District's decision in *Buck* is the same harm for which they now seek redress. In *Buck*, PFRS retirees sought a writ of mandate to compel the City and the Board to include the value of holiday pay in the calculation of retirement benefits pursuant to the terms of the Charter. After reviewing the Charter provisions defining "compensation" and "compensation attached to the average rank held," the *Buck* court decided that the remuneration earned by a member of the Department for working on a holiday did not constitute payment for overtime because it was received for working part of a regular 40-hour schedule. The court went on to conclude that the extra eight hours of holiday pay granted to a Department member "who works on a 'legal holiday' which falls during his regular 40-hour work week" is " 'extra compensation' " for "having worked on a 'legal holiday' " and "must be included in the computation of retirement allowances." Now, over 40 years later, the City is arguing—under the exact same Charter provisions—that the extra compensation payable to active members of the Department for working on a holiday should not be included in the calculation of PFRS retirement allowances. However, having had one chance to litigate this issue before the First District, the City is not now entitled to take another bite at the same apple.

Indeed, when viewed in this light, the fact that the right of active members to receive holiday premium pay for working on holidays has been contained in a series of salary ordinances and MOU's over the years is essentially irrelevant. (Compare *Price v. Sixth Dist. Agricultural Assn.* (1927) 201 Cal. 502, 509-510 [cause of action identical for

18

purposes of res judicata where contract in second action is substantially similar to contract upheld in first action and covers the same subject matter].)  Similarly, the inclusion in the 2006-2015 MOU of express language defining the rights of active members to certain holiday pay when they *do not* work on a holiday has no bearing on active members' continuing entitlement to receive extra compensation when they do. Although the amount of remuneration  has changed over the years, for over four decades active members of the Department have possessed an unbroken right to holiday pay for working on holidays.  And, based on *Buck*, PFRS retirees have been entitled—during that same period—to have such holiday pay included in the calculation of their retirement allowance.  Under such circumstances, the City should not be allowed to reopen the exact same issue of holiday premium pay that was previously considered and decided against it in *Buck*.  (Compare *Rynsburger v. Dairymen's Fertilizer Cooperative, Inc.* (1968) 266 Cal.App.2d 269, 278 [rule of res judicata should not be defeated by " 'minor differences of form, parties, or allegations, when these are contrived only to obscure the real purpose—a second trial on the same cause between the same parties. . . .' [Citations]"].)[10]

---

[10] The City attempts to avoid this result by arguing that the Association has waived its right to raise the issue of res judicata.  We are mindful of the authority stating that the defense of res judicata can be waived if it is not pled.  (See *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 758 (*Thibodeau*); see also Code of Civ. Proc., § 1908.5.)  In the present case, however, the Association argued the preclusive effect of *Buck* before the Board (Presentation to the Board dated January 26, 2011 at p. 11 ["*Buck* is binding on the City and PFRS"]), and these materials were incorporated into the trial record.  Further, the Association argued before the trial court that *Buck* was controlling.  In addition, the Board expressly pled res judicata as an affirmative defense in its answer ("City's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata, by virtue of the prior judgments in *Buck* and/or *Arca*.")  And, in its Complaint in Intervention (which operates as an answer), the Association stated: "Intervenors affirmatively allege that they are entitled to be compensated for  holidays as if they had worked the holidays, and that this conclusion is warranted through prior court determinations . . . ."  (See *Baldwin-Lima-Hamilton Corp. v. Superior Court* (1962) 208 Cal.App.2d 803, 814.)  Finally, the trial court reached the issue, finding the doctrine of res judicata inapplicable.  Under such circumstances, we conclude that no waiver occurred.  (Compare *Thibodeau, supra,* 4 Cal.App.4th at p. 758 [defense of res judicata

19

Of course, we do not mean to imply that the City is forever bound by the mandate of *Buck,* regardless of current circumstances.  That is clearly not the law.  Rather, as the First District has summarized: "The theory of estoppel by judgment or res judicata . . . *extends only to the facts in issue as they existed at the time the judgment was rendered* and does not prevent a reexamination of the same questions between the same parties where in the interim the facts have changed or new facts have occurred which may alter the legal rights of the parties.  *When other facts* or conditions *intervene* before a second suit, furnishing a new basis for the claims and defenses of the respective parties, *the issues are no longer the same and the former judgment cannot be pleaded in bar of the second action.*" (*American Broadcasting Cos. v. Walter Reade-Sterling, Inc.* (1974) 43 Cal.App.3d 401, 408.)  Thus, for example, in *California Employment Stabilization Com. v. Matcovich* (1946) 74 Cal.App.2d 398, 399-401, the court considered whether the operator of a " 'taxi dance hall' " and his "taxi dancers" had an employment relationship sufficient to trigger the payment of unemployment contributions.  The owner enforced numerous rules as to when and how the dancers could work and paid the dancers a percentage of the house earnings based on the services they performed.  Under these facts, the court concluded that an employment relationship existed. (*Id.* at pp. 400-402, 404.)  However, a previous judgment, covering a different period of time, had concluded exactly the opposite—that the taxi dancers were *not* in the employ of the owner.  The appellant argued that this prior decision was res judicata as to the status of the taxi dancers. (*Id.* at p. 401.)  In addressing the issue, the court noted that, during the time period covered by the prior case, no written contract existed and the dancers paid themselves from their own earnings after deducting a portion payable to the owner. (*Id.* at pp. 403-404.)  The court concluded that a fundamental change in the structure of the relationship between the taxi dancers and the owner had taken place between the two lawsuits.  Thus, the doctrine of res judicata did not apply, and re-examination of the same question between the same parties was appropriate. (*Id.* at. pp. 404-405.)

"adequately, though inartfully" pled by following statement—" 'Plaintiffs are estoppel [sic] from asserting the allegedly wrongful acts described in their Complaint' "].)

20

In the present case, in contrast, the City has failed to make any showing that a material change in circumstances has occurred since *Buck* with respect to the holiday pay issue which would justify its re-litigation. As stated above, neither the change in the underlying document providing the holiday pay benefit, nor the fact that the current MOU expressly discusses holiday pay for members who do not work holidays are material changes justifying re-litigation. Further, the City's specious argument—that retirees should not be compensated for working on holidays because they currently do not work—misses the point entirely and, regardless, has been true since *Buck* was decided. The appropriate inquiry is not whether retirees no longer work, but rather how active members are compensated for holiday work and whether this has changed significantly since *Buck*. The evidence presented in the trial court on this issue was clear and essentially uncontested by the City: PFRS members regularly worked holidays when they were active and, in fact, made contributions to PFRS based on the premium pay they received for holiday work. Moreover, active members of the Department currently work most holidays that fall during their regular work schedule and earn premium pay for doing so. Thus, holiday staffing and compensation practices have been consistent since *Buck*. Indeed, this common experience for police officers has been memorialized in a number of cases that have considered the holiday pay issue. (*City of Fremont v. Board of Administration* (1989) 214 Cal.App.3d 1026, 1031 [" '[b]eing subject to working on holidays as regular work days is normal for police officers' "]; see also *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 941 [citing City of Hayward's administrative rule that all police officers are regularly required to work on legal holidays].) Since the City has not pointed to any meaningful change in the holiday work patterns of Department members, it is not entitled, at this point, to re-open the issue of holiday pay.[11]

---

[11] In this regard, we note that the unanalyzed and incomplete payroll data submitted by the City in the trial court is wholly insufficient to indicate the kind of change necessary to trigger re-litigation of the holiday pay issue. Much of this information was essentially useless as it failed to connect the holiday pay amounts to a particular officer and/or that officer's schedule. We have, however, reviewed the raw payroll data supplied by the City for the two-week pay period ending January 6, 2012. While we doubt that the two-

21

Nor do we view the First District's decision in *Kreeft* as materially changing the legal landscape with respect to the provisions in the Charter which govern the calculation of PFRS retirement benefits, including those based on holiday pay. In *Kreeft*, the First District considered whether FLSA overtime pay received by certain active firefighters was " 'attached to the rank' " PFRS retirees held at the time they retired and must therefore be included in the calculation of their pensions. (*Kreeft, supra,* 68 Cal.App.4th at pp. 48-49.) The evidence in *Kreeft* included detailed data which showed that active firefighters received FLSA overtime pay only on an average of 2.21-2.57 times out of the 13.5 yearly pay periods. (*Id.* at p. 50.) In addition, "the amount and frequency of FLSA premium pay varied widely from individual to individual and from rank to rank." (*Ibid.*) Indeed, the City's economic expert concluded that "the 'average' annual number of times all firefighters received FLSA premium pay from 1992 to 1995 (2.5) was not a meaningful predictor of the experience of *most* firefighters." (*Id.* at p. 51.)

Based on all of these circumstances, the *Kreeft* court held that the FLSA overtime pay at issue was not "compensation attached to the rank" because it was not incident to the rank held, but was rather a function of the actual hours a firefighter worked during each pay period and was therefore "attached" to an individual firefighter's schedule. (*Kreeft, supra,* 68 Cal.App.4th at pp. 49, 55, 61.) To be " 'attached to the rank' " the court opined, "the employee must be entitled to the compensation by virtue of the rank, and not his individual efforts over and above what are required to obtain the rank." (*Id.*

_____

week pay period encompassing a Sunday New Year's holiday represents the typical experience of most Department members for most holidays, even a cursory review of the data in light of other information contained in the record permits certain conclusions to be drawn. First, it appears that the majority of active Department members work 10- or 12-hour shifts, rather than the traditional 8-hour shift. Secondly—although there were entries that we could not interpret with the information available in the record—it appears that essentially all active members receive between 8 and 18 hours of holiday pay in connection with the occurrence of a holiday, based on the length of their usual shift. Thus, members who work on a holiday receive holiday pay of 12, 15, or 18 hours. Members for whom a holiday falls on a regular day off receive holiday pay of 8, 10, or 12 hours. And, finally, members who take a holiday off receive holiday pay of 8, 10, or 12 hours.

at pp. 57-58.) The court went on to distinguish the circumstances in *Kreeft* from other " 'variable' " cases in which some members of the same rank received a benefit while others did not. (*Kreeft, supra,* 68 Cal.App.4th at pp. 58-61; see, e.g., *Dunham, supra,* 7 Cal.App.3d at pp. 511-516 [salary increase based on longevity and training requirements]; *Estes v. City of Richmond* (1967) 249 Cal.App.2d 538, 541, 546 ["hazardous duty pay" for completing one "tour of duty" each month]; *Abbott v. City of Los Angeles* (1960) 178 Cal.App.2d 204, 213-215 [longevity and merit pay].) In those cases, the variability was limited to whether an employee did or did not qualify for the benefit, and there was evidence that the retirees, while working, had performed the services that would have entitled them to the extra compensation. (*Kreeft, supra,* 68 Cal.App.4th at p. 60.) *Kreeft*, in contrast, involved a situation where there was not only variability regarding *who* was entitled to the benefit, but there was also a wide disparity in *the amount* of extra compensation such members were entitled to. Further, there was no evidence that the retirees, while working, had schedules that would have qualified them for the FLSA pay. Under these facts, the FLSA compensation at issue " 'attached' " to an individual firefighter's schedule rather than to his/her rank. (*Id*. at pp. 59-61.)

We view *Kreeft* as a common-sense application of the Charter provisions to particular facts rather than as a significant departure from existing precedent. Certainly, there is nothing in the statutory analysis engaged in by the *Kreeft* court that could not have been argued to the First District in *Buck.* For instance, it could easily have been urged that working on a holiday was based on individual effort and scheduling rather than rank. (Compare *Kreeft, supra,* 68 Cal.App.4th at pp. 57-58.) A " 'prior judgment is res judicata on matters which were raised or could have been raised, on matters litigated or litigable.' " (*Kronkright v. Gardner* (1973) 31 Cal.App.3d 214, 217, quoting *Sutphin v. Speik* (1940) 15 Cal.2d 195, 202.) "Were the rule otherwise, litigation finally would end only when a party ran out of counsel whose knowledge and imagination could conceive of different theories of relief based upon the same factual background." (*Kronkright v.*

23

*Gardner, supra,* 31 Cal.App.3d at p. 216.)  Thus, the analysis set forth in *Kreeft* does not, itself, provide a basis for re-visiting the issue of holiday pay.[12]

In sum, the City's claim in this case constitutes the same cause of action as that previously decided against the City in *Buck*.  Further, there are no intervening changes in facts or law that would justify a re-examination of the same issue between the same parties.  Thus, the City is barred by the doctrine of res judicata from re-litigating the issue of holiday premium pay.

### C.    *Shift Differential Pay*

The Association does not, in this appeal, contest the merits of the trial court's determination that shift differential pay is not "compensation attached to rank" for purposes of calculating PFRS retirement benefits.  Rather, it cites two procedural grounds as the bases for its conclusion that the trial court's decision with respect to shift differential pay was improper.  First, the Association argues that the trial court was barred from considering the question of shift differential pay because the City did not exhaust available administrative remedies with respect to that issue.  Second, the Association contends that the trial court decision with respect to shift differential pay was improperly premised upon inadmissible extra-record evidence.  We address each assertion in turn.

---

[12] Indeed, were we to throw out the holding in *Buck* and reconsider the holiday pay issue generally in light of *Kreeft,* it is not at all clear that a different outcome would result.  As stated above, it appears that essentially all members of the Department currently receive between 8 and 18 hours of holiday pay for every holiday simply for being on the force. Thus, holiday compensation seems to be incident to rank rather than individual effort. And, while it is true that there is variation in the amount of extra compensation paid to each member based on schedule, we disagree with the trial court that *any* such variability is fatal under *Kreeft*.  In fact, *Kreeft* speaks of the FLSA pay at issue being "widely" varied.  (*Kreeft, supra,* 68 Cal.App.4th at p. 60.)  The variation in the present case, in contrast, is much more narrowly focused and predictable.  Were a proper analysis to be done, we would not be surprised to find that the 12 hours of holiday pay currently used in the calculation of PFRS retirement benefits pursuant to *Buck* represents an average that is a "meaningful predictor of the experience of *most*" Department members.  (Cf. *id.* at pp. 50-51.)

24

## 1. *Exhaustion of Administrative Remedies*

Section 2603 of the Charter provides in relevant part: "The Board may and in disputed matters shall hold public hearings in all proceedings pertaining to retirement and to the granting of retirement allowances, pensions, and death benefits. Notice of the time and place of such hearing shall be given in writing to the member or dependents affected thereby . . . . The member or dependents affected thereby shall be entitled to appear personally at said hearing and to have counsel." It is undisputed that the City did not request a hearing before the Board in accordance with section 2603 on the propriety of including shift differential pay in the calculation of PFRS retirement benefits as "compensation attached to rank." The Association contends that such a hearing was an administrative prerequisite to litigation and, since the City failed to exhaust available administrative remedies with respect to shift differential pay, its claim should not be considered. The City, in contrast, argues that section 2603 merely creates a claims procedure for PFRS members and is therefore inapplicable to disputes between the City and the Board.[13]

The trial court ruled that the City had no exhaustion requirement. Agreeing with the City's characterization of section 2603 as a claims procedure for members, the trial court concluded that "[t]he Board's hearing process is not designed to address disputes between the City and the Board regarding the System's obligations to retirees and the City's resulting obligation to fund the System." We review this determination de novo. (*Ortega v. Contra Costa Community College Dist.* (2007) 156 Cal.App.4th 1073, 1080.)

It is well settled in California that, where an administrative remedy is provided, relief must be sought first from the administrative body before recourse to the courts is

---

[13] Although neither party mentions it, we note that in the *Arca II* case discussed above the *City* argued that the police retirees and their representatives had failed to exhaust administrative remedies pursuant to section 2603 of the Charter. The *Arca* II court ultimately issued a writ requiring the City and the Board to credit retirees with the full 12 hours of holiday pay without any discussion of the City's exhaustion claim. We have taken judicial notice of and have reviewed the superior court's file in *Arca II* pursuant to subdivision (d) of section 452 of the Evidence Code.

25

permitted. (*Unfair Fire Tax Com. v. City of Oakland* (2006) 136 Cal.App.4th 1424, 1428 (*Unfair Fire*); see also *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292.) This doctrine of administrative exhaustion allows an administrative body to develop the factual background of the case and apply its expertise to the situation, while keeping the overworked courts out of the dispute unless absolutely necessary. (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1489-1490 (*Newhall County*).) Where, as here, traditional mandamus is sought, " 'the exhaustion requirement speaks to whether there exists an adequate legal remedy. If an administrative remedy is available and has not yet been exhausted, an adequate remedy exists and the petitioner is not entitled to extraordinary relief.' " (*Eight Unnamed Physicians v. Medical Executive Com.* (2007) 150 Cal.App.4th 503, 511 (*Eight Unnamed Physicians)*, quoting *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620.)

Focusing on the Charter provisions at issue in the present case, we agree with the trial court and the City that the hearing procedures look more like a claims process for individual PFRS members than a generalized administrative remedy. (See *City of Fresno v. Superior Court* (1984) 156 Cal.App.3d 1137, 1143-1144 [principles of statutory construction requiring the ascertainment of legislative intent apply to charters; where there is no direct evidence of such intent, the court must turn to the words of the charter].) Specifically, section 2603 of the Charter, itself, provides that notice of any hearing must be given "to *the member* or dependents affected thereby . . . ." (Italics added.) Moreover, "*[t]he member* or dependents affected thereby" are entitled to appear personally at the hearing with counsel. (*Ibid,* italics added*.*) The Charter further authorizes "*[a]ny member . . .* who is dissatisfied with any order or decision of the Board" to seek a writ of mandate in the courts without first applying to the Board for a rehearing. (Charter, art. XXVI, § 2605, italics added.) Finally, the Charter provides that the rehearing and writ remedies discussed above "shall be available to *any member . . .* affected by any order or decision of the Board without prejudice to the right to pursue any

26

other remedy provided for by the laws of the State of California." (*Id.*, § 2606, italics added.) [14]

Moreover, even if we were to construe the Charter language requiring a public hearing before the Board "in all proceedings pertaining to retirement and to the granting of retirement allowances, pensions, and death benefits" broadly to include disputes with the City, we would still conclude that the process articulated in the Charter is insufficient to create a mandatory exhaustion requirement. This is because exhaustion of administrative remedies is not required where the available remedy is inadequate. (*Newhall County, supra,* 161 Cal.App.4th at p. 1490; *Eight Unnamed Physicians, supra,* 150 Cal.App.4th at p. 511.) As the Supreme Court has opined: "Our courts have repeatedly held that the mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an 'administrative remedy' unless the statute or regulation under which that power is exercised establishes *clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties.*" (*Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566, italics added (*Rosenfield*).)

Thus, for instance, in *City of Coachella, supra,* 210 Cal.App.3d at pp. 1281-1283, the local airport land use commission appealed from the grant of a writ of mandate in favor of the City of Coachella which voided the commission's Thermal Airport Land Use Plan (TALUP). The commission argued that the city had failed to exhaust available administrative remedies, which included the public hearings held by the commission

---

[14] Indeed, pursuant to section 2603 of the Charter, proof of service to all affected members and dependents must be made at any scheduled public hearing. Moreover, all individuals so noticed are entitled to be present and represented by counsel. (*Ibid.*) In the instant case, the City's hearings on the holiday pay issue clearly affected the rights of *all* PFRS police members and dependents and thus—if the hearings were held pursuant to section 2603—all such members and dependents should have been notified and could have appeared with counsel. There is no indication in the record, however, that this mass notification occurred or that an unwieldy number of individual retirees appeared with counsel in tow. Thus, it appears that even the Board did not think that the City's hearing was proceeding pursuant to the Charter process.

incident to the adoption of the TALUP and a commission regulation requiring it to schedule a meeting " 'to consider matters relevant to its duties and responsibilities when requested by . . . a local planning agency . . . .' " (*Id.* at pp. 1287-1288.) Citing *Rosenfield*, the appellate court concluded that exhaustion was not required. (*City of Coachella, supra,* 210 Cal.App.3d at p. 1287.) Specifically, the court determined that the public hearing process did not constitute an adequate administrative remedy because the "public hearings held by the [c]ommission with regard to the adoption of the TALUP did not require that the [c]ommission *do* anything in response to submissions or testimony received by it incident to those hearings." (*Ibid.*) Similarly, the commission's meeting requirement also failed to establish an adequate administrative remedy: "While it is true that this rule *does* contain a mandatory provision requiring the scheduling of meetings, it is also true that the rule *does not* mandate that anything be done as a result of such meetings. This duty to hold meetings amounts to nothing more than an obligation to exercise a general investigatory power." (*Id.* at p. 1288.)

The First District has consistently endorsed the approach announced in *Rosenfield* and applied in *City of Coachella*. (See, e.g., *Unfair Fire, supra,*136 Cal.App.3d at pp. 1429-1430 [ordinance allowing appeal to city council contesting the city's creation of a fire suppression district insufficient to create adequate administrative remedy where "nebulous" procedure does not state how the appeal should be taken, whether there will be a hearing, when the matter will be heard, what evidence may be presented or the standard for reconsideration of the council's initial decision]; *Lindelli, supra,* 111 Cal.App.4th at pp. 1105-1106 [opportunity to participate in a public hearing not an adequate administrative remedy where city council "not required to do anything in response to their participation"]; *Martino v. Concord Community Hospital Dist.* (1965) 233 Cal.App.2d 51, 57 [no adequate administrative remedy for a physician whose application for appointment to hospital medical staff was "deferred" where hospital bylaws provide only that appeal will be "considered" and fail to set forth "any procedure for the hearing or determination of the appeal"] (*Martino*).) Applied to the facts of this case, these precedents compel the conclusion that section 2603 of the Charter does not

28

supply an "adequate" administrative remedy for the City. Exhaustion of administrative remedies was therefore not required.

For instance, as in *City of Coachella* and *Lindelli*, the public hearing requirement contained in section 2603 does not require the Board to do anything in response to the submissions or testimony received by it at the hearing. Thus, the procedure does not provide for the acceptance, evaluation and *resolution* of disputes. (See *Rosenfield, supra,* 65 Cal.2d at p. 566.) Further, as in *Unfair Fire* and *Martino*, the Charter contains no clearly defined procedures for the conduct of a hearing involving the City. (*Rosenfield, supra,* 65 Cal.2d at p. 566.) Specifically, there are no procedures regarding how to request a hearing, no timelines for when such a hearing will be held or concluded, and no standards for decision making. Simply put, even if section 2603 creates an available administrative remedy for the City, it is inadequate to trigger a mandatory exhaustion requirement. The cases cited by the Association and the Board in which exhaustion was required are distinguishable as involving challenges brought in the context of comprehensive regulatory schemes and do not change our analysis. (Compare *Newhall County, supra,* 161 Cal.App.4th at pp. 1489-1490 [appellant required to raise its concerns about water supply assessment with lead agency as part of comprehensive CEQA process before seeking judicial intervention]; *Chavez v. Civil Service Com.* (1978) 86 Cal.App.3d 324, 328-331 [single sentence dismissing challenge under *Rosenfield*; charter provisions at issue in *Rosenfield* "far less comprehensive" than civil service charter provisions and related commission rules at issue]; *Woodward v. Broadway Federal Sav. & Loan Assoc.* (1952) 111 Cal.App.2d 218, 223-225 [challenge to the validity of an election in the savings and loan context must be brought first to the Home Loan Bank Board under comprehensive federal regulations it has promulgated which "govern the operation of federal savings and loan associations from their inception to their dissolution"].) Thus, while it might certainly be the better practice to air any PFRS disputes before the Board prior to resorting to the courts, the City was not required to do so.

## 2. *Extra-Record Evidence*

Having passed the exhaustion hurdle, we must now decide whether the trial court's determination with respect to shift differential pay must nevertheless be overturned because the trial court impermissibly considered extra-record evidence in reaching its decision. Specifically—in response to an express request by the trial court—the City submitted significant additional evidence, including an analysis of payroll records, supporting its argument that shift differential pay is not "compensation attached to the rank" under *Kreeft.* Citing *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 574 (*Western States*), the Association urges that in mandamus proceedings challenging quasi-legislative administrative decisions, the trial court is strictly limited to the administrative record, and thus consideration of this additional evidence was error. Under the facts of this case, however, the Association's argument is easily dismissed.

We recognize that there is an " 'unbroken line' " of cases holding that extra-record evidence is not admissible to challenge quasi-legislative decisions. (*San Joaquin County Local Agency Formation Com. v. Superior Court* (2008) 162 Cal.App.4th 159, 167.) Equally well settled, though, is the exception to this general rule allowing for the "admission of extra-record evidence in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." (*Western States, supra,* 9 Cal.4th at p. 576.) This exception applies "because the record upon which a public agency's informal action is based is often inadequate to permit meaningful review." (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 255.) Generally, administrative actions that do not involve public hearings are considered "informal." (*Ibid.;* see also *California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 581.) Here, there was no administrative hearing with respect to the inclusion of shift differential pay in the calculation of PFRS benefits, and we have concluded that such a hearing was not a prerequisite to judicial review. Under such circumstances, the development of essential facts by the trial court with respect to shift differential pay was not error.

30

*C.* ***Equitable Defenses***

Based on its analysis of the holiday pay and shift differential pay issues before it, the trial court determined that PFRS retirement benefits had been calculated improperly in a number of ways, leading to overpayments to PFRS retirees. The court further concluded that the City had not waived its right to collect these overpayments by failing vigorously to press the matter. Rather, the trial court opined that the retirees had no right to retain benefits paid to them improperly and directed the Board to "develop and implement a plan to collect the overpayments."

The Association argues that the trial court erred by mandating the recovery of overpayments made to PFRS retirees. Specifically, the Association contends that any retroactive application of the decision should be barred by the equitable doctrines of estoppel and laches, by the statute of limitations, and/or by the hardship exception to retroactivity. Alternatively, the Association claims that the matter should have been remanded to the Board so that it could consider the Association's equitable claims and defenses in the first instance. With respect to the rate of holiday premium pay, we have concluded that PFRS benefits were appropriately calculated in accordance with *Buck*, and thus no repayment is required. We will therefore consider the Association's arguments in the context of the two other types of overpayments that remain at issue.

*1. Shift Differential Pay*

As noted earlier, the Association did not contest on appeal the trial court's underlying conclusion that shift differential pay is not "compensation attached to rank," and therefore the propriety of that decision is not before us. However, the Association does argue that any past overpayments made to PFRS retirees due to the improper inclusion of shift differential pay in their benefit calculation should not be recoverable. We believe these shift differential overpayments are best analyzed under theories of equitable estoppel.

The doctrine of equitable estoppel is founded on notions of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that person has intentionally led others to believe a particular circumstance to be true and to rely upon

31

such belief to their detriment.  (*Killian v. City and County of San Francisco* (1978) 77 Cal.App.3d 1, 13.)  " 'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' "  (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 257 (*Golden Gate*), quoting *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 (*Driscoll*).)  Where, as here, a party seeks to invoke the doctrine of equitable estoppel against a governmental entity, an additional element applies.  That is, the government may not be bound by an equitable estoppel in the same manner as a private party unless, "in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496-497 (*Mansell*); see also *Driscoll, supra,* 67 Cal.2d at p. 306 ["doctrine of equitable estoppel may be applied against the government where justice and right require it"].)

Arguing that it raises factual questions, the Association contends that the issue of equitable estoppel should be considered first by the Board.  However, where the facts are undisputed, whether equitable estoppel applies is a question of law. (*Golden Gate, supra,* 165 Cal.App.4th at p. 257.)  Moreover, where the issues require a weighing of policy concerns, they too present a question of law.  (*Ibid.*)  In the present case, the record contains undisputed facts sufficient to inform our determination regarding the applicability of equitable estoppel to the shift differential overpayments.

The record reflects, for instance, that certain PFRS retirees received retirement benefits based on line-up pay since the 1984 judicial determination in *Arca I* that line-up pay was "compensation attached to rank."  Further, it is clear that shift differential pay was instituted for active members of the Department as part of the 2001-2006 MOU, the same MOU that abolished line-up pay for active members.  It is also undisputed that, on

March 27, 2002, the City sent a letter to PFRS retirees asserting in a definitive fashion that shift differential pay had "replaced" line-up pay and would be included in the calculation of retirement benefits as of April 1, 2002, for PFRS retirees who had previously received line-up pay. The City was clearly aware (as it had been litigating the matter for decades) that only "compensation attached to rank" is properly included in the calculation of PFRS benefits. However, the City never asked the Board to determine whether shift differential pay was appropriately characterized as "compensation attached to rank." Nor is there any indication in the record that the City disputed the inclusion of shift differential pay in PFRS retirement allowances until it filed this action in July 2011. Thus, for almost a decade, the City actively asserted that shift differential pay should be treated as "compensation attached to rank," and the Board had knowledge of, and acquiesced in, the City's characterization.[15]

---

[15] Whether the City's representation in this case is characterized as a statement of fact (shift differential pay will be included in the calculation of benefits for certain PFRS retirees as of a specified date) or a legal conclusion (shift differential pay is "compensation attached to rank" and therefore properly included in the caculation of PFRS benefits) is not dispositive. Clearly, it has been held that "(in the absence of a confidential relationship) where the material facts are known to both parties and the pertinent provisions of law are equally accessible to them, a party's inaccurate statement of the law . . . cannot give rise to an estoppel. Some cases assert that this simply amounts to a 'mutual mistake of law' and others remark that the estoppel elements of ignorance and *reasonable* reliance are absent." (*Jordan v. City of Sacramento* (2007) 148 Cal.App.4th 1487, 1496.) However, where, as here, a confidential relationship exists among the parties, estoppel can be applied based on the advice given to PFRS retirees regarding their substantive rights. (*Id.* at pp. 1497-1498 [discussing *Driscoll*]; see also *Driscoll, supra,* 67 Cal.2d at pp. 306-310; *Canfield v. Prod* (1977) 67 Cal.App.3d 722, 731-733 [county estopped from asserting statute of limitations against public assistance recipient who had confidential relationship with, and was improperly advised by, county]; *Crumpler, supra,* 32 Cal.App.3d at pp. 571-572, 581-582 [city estopped from retroactively reclassifying animal control officers as miscellaneous members of PERS where officers were advised by the city that they would be classified as local safety members and were treated as such for years].) Under such circumstances, the court considers a variety of factors focused on the culpability of the public agency and the impact of the advice on the claimant, including: (1) whether the advice was negligent at the time it was made; (2) whether the agency acted in bad faith; (3) whether the agency purported to "advise and direct" the claimant rather than merely "inform and respond";

33

Under these circumstances, we believe that all of the requisite elements of equitable estoppel are present. As stated above, the City clearly knew that only "compensation attached to rank" could be included in the calculation of PFRS retirement benefits, yet it negligently asserted that shift differential pay was pensionable without verifying the accuracy of this position either through advice from the Board or from any other qualified source. (Compare *Crumpler, supra,* 32 Cal.App.3d at p. 582.) As the Fourth District opined in *Crumpler*: "The fact that the advice may have been given in good faith does not preclude the application of estoppel. Good faith conduct of a public officer or employee does not excuse inaccurate information negligently given. [Citations.] In a matter as important to the welfare of a public employee as his pension rights, the employing public agency ' "bears a more stringent duty" ' to desist from giving misleading advice. [Citation.]" (*Ibid.*; see also *Mansell, supra,* 3 Cal.3d at p. 491 ["[e]specially in cases where the party to be estopped has made affirmative representations . . . knowledge of the true facts will be imputed to one who, in the circumstances of the case, ought to have such knowledge].)

Further, the City manifestly intended that its careless representation regarding shift differential pay would be acted upon by the PFRS retirees to whom it was directed, and the retirees had the right to believe that this was the City's intent. In addition, the retirees were unaware that the City's advice was erroneous and were likely not in a position to uncover the error. (See *Driscoll, supra,* 67 Cal.2d at p. 308 [significant for estoppel purposes that claimant "is one who purports to have no knowledge or training which would aid him in determining his rights and the public agency purports to be informed and knowledgeable in these matters"].) Finally, the PFRS retirees reasonably relied upon the City's representation by ordering their financial affairs for almost a

---

(4) whether the agency acted with certitude in dispensing the advice; (5) whether a confidential relationship exists; (6) whether the right asserted was one of "great magnitude"; and (7) whether the claimant purports to have no knowledge or training while the agency purports to be informed and knowledgeable. (*Driscoll, supra,* 67 Cal.2d at pp. 306-311.) Any one of these factors can be determinative under the facts of a particular case. (*Id.* at pp. 309-310.)

34

decade under the misapprehension that their retirement benefits were, in fact, larger than they actually were.[16]

In addition, after weighing the interests at stake in this case, we conclude that "the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Mansell, supra,* 3 Cal.3d at pp. 496-497.) Cases which have applied the doctrine of equitable estoppel in the area of public employee pensions have emphasized the "unique importance" of pension rights to the well-being of the holders of those rights. (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 28 (*Longshore*); see also *Driscoll, supra,* 67 Cal.2d at p. 310 [noting case involved "fundamental" claims involving pension rights of "great magnitude"].) In contrast to these significant pension entitlements, the City highlights the "important public policy" of protecting the integrity of the PFRS fund, and, ultimately, City taxpayers. It is certainly true that, pursuant to the Charter, the City is required to contribute "such amounts as may be necessary" over and above member contributions and investment income to the PFRS fund. (Charter, art. XXVI, § 2619.) Thus, it is possible that resolution of this overpayment issue may ultimately have some impact on the contribution obligation of the City and its taxpayers. However, the people of this State have already weighed these competing interests and have determined that fiscal concerns can be trumped, in certain circumstances, by individual pension rights. Specifically, pursuant to article XVI of the California

---

[16] Indeed, the record reflects that PFRS members who were active in 2003 were offered a one-time opportunity to transfer from PFRS to PERS. (See Charter, § 2600.) It is reasonable to assume that their decisions to remain with PFRS were based, at least partially, on their understanding of the benefits to which they were entitled under PFRS and to which they would be entitled upon transfer to PERS. (Compare Gov. Code, § 20636, subd. (g)(3)(B) [including as " 'compensation earnable' " for purposes of calculating PERS benefits "[c]ompensation for performing normally required duties, such as holiday pay, bonuses (for duties performed on regular work shift), educational incentive pay, maintenance and noncash payments, out-of-class pay, marksmanship pay, hazard pay, motorcycle pay, paramedic pay, emergency medical technician pay, Peace Officer Standards and Training (POST) certificate pay, and split shift differential"].)

35

Constitution, the duty of a public retirement board to its participants and their beneficiaries "shall take precedence over any other duty," including minimizing employer contributions and defraying administrative costs. (Cal. Const., art. XVI, § 17, subd. (b).) Similarly, under the present facts, we conclude that the City's budgetary issues, while not insignificant, must give way to the legitimate pension concerns of the impacted PRFS retirees, especially in the absence of any evidence that such a decision will negatively impact the City's contribution rate or impair the financial integrity of the PFRS fund. (Compare *Baillargeon v. Department of Water & Power* (1977) 69 Cal.App.3d 670, 680 [interest in actuarially sound pension and benefit system not controlling where little likelihood estoppel would harm the system from any actuarial standpoint]; see also *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 458 [no evidence that underfunding due to retroactive increase in benefits "would in any way jeopardize the financial integrity of any retirement system"].)[17]

The City contends, however, that estoppel is improper in this case because it would enlarge the statutory power of the Board. Specifically, according to the City, invoking estoppel under these facts would require the Board to act in violation of the Charter. We do not find this argument compelling. Undoubtedly, there is a line of cases holding that estoppel cannot lie to contravene any statutory limitation on an agency's authority. (See *Longshore, supra,* 25 Cal.3d at p. 28 ["no court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations"]; *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 542-543 [estoppel barred as matter of law where PERS statute precludes treatment of standby pay as pensionable compensation]; *Medina v. Board of Retirement* (2003) 112 Cal.App.4th

---

[17] We are well aware of the financial pressure currently being brought to bear on local governmental entities throughout California, as pension costs have continued to spiral upward during this period of economic constriction. (See, e.g., Lyman & Walsh, *Police Salaries and Pensions Push California City to Brink*, N.Y. Times (Dec. 27, 2013) U.S. pp. 1-2; Onishi & Lyman, *Cut Salaries, Not Pensions in San Jose, Judge Rules*, N.Y. Times (Dec. 23, 2013) U.S. p. 1.) While compelled to reach the conclusions we have in the context of these proceedings, we are not unsympathetic to the City's overarching financial concerns.

864, 869-871 [estoppel not available because retirement board lacked authority to classify as safety members employees that do not meet the statutory definition]; *Fleice v. Chualar Union Elementary School Dist.* (1988) 206 Cal.App.3d 886, 893 [estoppel cannot expand a public agency's powers]; *Crumpler, supra,* 32 Cal.App.3d at p. 584 [not a case where invoking estoppel would enlarge the statutory power of the board].)  Indeed, were we dealing with the *prospective* application of estoppel on these facts, we might well find this authority controlling, as prospective application of estoppel would require the Board to calculate retirement allowances using an item of compensation that has been judicially determined not to be "compensation attached to rank," in contravention of the express dictates of the Charter. (Charter, art. XXVI, §§ 2607, 2608 & 2610.)  Under such circumstances, the Board could be deemed to " 'utterly [lack] the power to effect that which an estoppel against it would accomplish.' " (*Crumpler, supra,* 32 Cal.App.3d at p. 584, quoting *Mansell, supra,* 3 Cal.3d at p. 499.)

Here, however, we are dealing with the treatment of overpayments by the Board, an area in which we believe the Board has some discretion.  As we have emphasized, pursuant to the terms of both the California Constitution and the Charter, the Board has "plenary authority and fiduciary responsibility for investment of moneys and administration of" PFRS.  (Cal. Const., art. XVI, § 17; see also *id.*, § 17, subd. (a) ["[t]he retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system"]; Charter, art. XXVI, § 2601(e) [the Board is responsible for the management and administration of PFRS and has "exclusive control of the administration and investment" of all PFRS funds].)  This includes the periodic actuarial valuation of the system based on the "mortality, service, and compensation experience of the members and beneficiaries" as well as on the amount of interest being earned.  (Charter, art. XXVI, § 2602(b).)  At the conclusion of this multi-faceted analysis, the Board may adjust interest rates, mortality and service tables, and member and City rates of contribution in accordance with the terms of the Charter to ensure the actuarial health of the system. (*Ibid.*; see also *In re Retirement Cases, supra,* 110 Cal.App.4th at p. 459 [" '[a]ctuarial

37

methodology is designed to address and consider unforeseen events on a regular basis so as to ensure the financial integrity of the retirement system,' " quoting the trial court].) In making the many complex adjustments required for system administration, the discretion of the Board is circumscribed by section 17 of article XVI of the California Constitution which mandates that public retirement boards "discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system." (Cal. Const., art. XVI, § 17, subd. (b).) Further, "[a] retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty." (*Ibid.*) Since the Charter does not contain any express provisions regarding the collection of improper payments from retirees, any such overpayments must be analyzed under these general grants of Board authority. (Compare Gov. Code, § 20160 [specific statute setting standards for the correction of payment errors under PERS].)

Given this statutory backdrop—where the Board's decision making must prioritize the rights of retirees while making complex decisions impacting multiple variables—we believe that the Board has discretion to decide whether, how and to what extent any overpayments made to PFRS retirees should be repayable to PFRS. And, in fact, courts in analogous situations have reached similar conclusions. In *In re Retirement Cases, supra,* 110 Cal.App.4th at 426, for instance, the First District determined that retirement boards operating under the County Retirement Law of 1937 (CERL) have the power to collect arrears contributions to help defray the cost of unanticipated benefits owed to retirees, but that the boards were not mandated to do so. (*In re Retirement Cases*, *supra*, 110 Cal.App.4th at pp. 469-472.) The court noted that the retirement boards had a number of options for handling "the shortfall resulting from their mistaken interpretation of CERL" and that it could not determine whether a board had abused its discretion until it had exercised that discretion to "correct for its miscalculations." (*Id.* at pp. 470-471.) The court observed in this regard that the board's discretion was not unfettered, but was instead necessarily constrained by the requirements of section 17 of article XVI of the

38

California Constitution which we have previously summarized. (*In re Retirement Cases, supra,* 110 Cal.App.4th at pp. 471-472.) Similarly, in *Barrett v. Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593, the Fifth District considered a reclassification under CERL that entitled affected employees to earlier retirement eligibility and increased pension benefits. (*Id.* at p. 1597, fn.1.) The trial court had concluded that the reclassification must be done without requiring the payment of any arrears contributions and/or interest by the affected employees. (*Id.* at pp. 1600-1601.) The Fifth District reversed, holding that the retirement board had the authority to collect arrears contributions from employees, but that it was improper for the courts to mandate it do so. (*Id.* at pp. 1608-1610, 1613-1614.) Specifically, the *Barrett* court opined: "When a statute imposes upon an administrative body discretion to act under certain circumstances, mandate will not lie to compel the exercise of such discretion in a particular manner." (*Id.* at p. 1613.) Thus, the trial court's attempt to "compel" the retirement board to "exercise its discretion in a particular manner" was improper. (*Id.* at pp. 1613-1614.) These cases support our conclusion that the Board has discretion (subject to the constitutional constraints described above) with respect to the collection of overpayments. (Compare Gov. Code, § 20160, subd. (e)(3) [retroactive correction of errors under PERS shall not take place if "the purposes of this part will not be effectuated" by the retroactive correction].) Since the Board has discretion in this area, applying the doctrine of estoppel to prevent the Board from collecting certain specified overpayments would not result in a situation where the Board is required to act in excess of its statutory authority.

Finally, we also reject the City's argument that failure to mandate the return of overpayments in this case is somehow a "gift of public funds" in contravention of section 6 of Article XVI of the California Constitution. Our conclusion in this regard does not, as the parties argue, hinge on whether the constitutional ban on such gifts applies to charter cities such as the City. (See *Tevis v. City & County of San Francisco* (1954) 43 Cal.2d 190, 197.) Rather, we find dispositive the *character* of the funds at issue. The PFRS retirement account contains not just public moneys supplied by the City, but also

39

significant private assets contributed by active PRFS members.  (See Charter, art. XXVI, § 2619.)  Pursuant to section 17 of article XVI of the California Constitution, "[t]he assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system."  (Cal. Const., art. XVI, § 17, subd. (a).)  Moreover, by the express terms of section 17, the fiduciary responsibilities it embodies take precedence over all other provisions of law, including other constitutional mandates.  (Cal. Const., art. XVI, § 17.)  We have previously concluded that both section 17 and the Charter provide the Board with significant discretion in the administration of PFRS, including in the collection of any overpayments made to PFRS retirees.  To allow the exercise of this discretion to be challenged as a gift of public funds whenever someone disagrees with the fiscal consequences of a particular Board decision would seriously undermine the Board's "plenary authority" with respect to PFRS administration.

We find, then, that, in the present case, all of the requisite elements justifying estoppel are present.  Moreover, application of the doctrine to these facts is not barred by any of the arguments advanced by the City.  We therefore conclude that the City and the Board are estopped from requiring PFRS retirees to repay any retirement benefits based on the improper inclusion of shift differential pay as "compensation attached to rank."

2.     *Number of Designated Holidays*

We turn lastly to the overpayments generated in connection with the temporary reduction in the number of designated holidays for the 2009, 2010, and 2011 fiscal years.  As discussed above, the 2006-2013 MOU briefly changed the structure of holiday pay for active members of the Department.  Specifically, for the 2009, 2010, and 2011 fiscal years, only 7 of the regular 13 holidays were paid in accordance with the customary policy established by the MOU.  For the other six holidays, active members received no holiday pay for holidays that were not worked and "straight time pay" for holidays that were worked.  Although the total holiday compensation paid to active members of the Department was clearly reduced during this timeframe, the Board continued to calculate

40

retirement benefits for PFRS retirees as if this temporary reduction had not occurred. Based on the plain language of the Charter and the 2006-2013 MOU, the trial court held that the reduction in holiday pay experienced by active members should have been reflected in PFRS benefits for the years in question. Specifically, retirees, during the relevant timeframe, should only have been credited with 7 holidays, rather than 12.[18] The Association does not here contest the trial court's conclusion that PRFS retirees received credit for too many holidays during the fiscal years in question. Rather, as with the shift differential overpayments, the Association argues that, for equitable reasons, the retirees should not be required to return any overpayments they received based on this excess holiday pay.

We do not see any grounds for estoppel based on the facts relevant to the temporary holiday reduction. The record reflects that the City negotiated an extension to the 2006-2010 MOU effective in July 2009 which extended its term to June 30, 2013, and added the language effecting the temporary reduction in holidays here at issue. In January 2010, a Board agenda item disclosed the City's position that the number of holidays credited to retirees should be reduced from 12 to 7 for fiscal years 2009, 2010, and 2011 based on the provisions of the extended MOU. On February 24, 2010, the City appeared before the Board and argued this position. The Board, however, determined on that same date that the temporary reduction in the number of paid holidays for active members of the Department would not be reflected in retiree benefits. The City then challenged this decision in the instant action, filed on June 14, 2011. Clearly, this is not a situation where the City has intentionally led others to believe a particular circumstance to be true and to rely upon such belief to their detriment. (*Killian v. City and County of San Francisco, supra,* 77 Cal.App.3d at p. 13.) The City has never counseled retirees that they are not bound by the temporary reduction in holidays to which active members of the Department were subjected. Rather, it has consistently taken the position that

---

[18] As stated in footnote 4, *supra*, active members have historically received an extra "floating holiday" in addition to the 12 designated holidays for which PFRS retirees have traditionally been credited.

41

failure to reduce the number of holidays when calculating pension benefits for the fiscal years in question was error. Although the Board calculated pension benefits in a way that was ultimately determined to be improper, there are no facts suggesting that they should be estopped from subsequently correcting this mistake.

The Association, however, also argues that repayment should be barred under a theory of laches. Laches is based on the principle that those who neglect their rights may be barred, in equity, from obtaining relief. (*Golden Gate, supra,* 165 Cal.App.4th at p. 263.) The elements required to support a defense of laches include unreasonable delay and either acquiescence in the matter at issue or prejudice to the defendant resulting from the delay. (*Ibid.*) Generally, laches is a question of fact, but where the relevant facts are undisputed, it may be decided as a matter of law. (*Ibid.*) Also, as with estoppel "laches is not available where it would nullify an important policy adopted for the benefit of the public." (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1381.)

Under the present circumstances, any delay by the City in bringing this action does not appear to have been unreasonable. The improper payments at issue occurred between July 2009 and June 2012. Although it waited for 16 months after the Board refused to reduce pension benefits based on the temporary reduction in holidays, the City commenced this action in June 2011, less than two years after the earliest date any improper payments were made and well within any applicable statute of limitations asserted by the parties. (See Code of Civ. Proc., § 338, subd. (a) [three-year statute of limitations for a liability created by statute]; *id.*, § 338, subd. (d) [three-year statute of limitations for mistake].) While it is true that the defense of laches may be invoked even though the lapse of time is less than the applicable period of limitations where "the unjustified delay has operated to the injury of another," *Holt v. County of Monterey* (1982) 128 Cal.App.3d 797, 801, any delay in this case has not significantly injured PFRS retirees. Rather, the improper payments were not substantial and were time-limited by the terms of the MOU. Moreover, these proceedings have already been pending for 32 months. Thus, even if the City had commenced this litigation immediately after the Board's adverse decision in February 2010, it seems likely that final resolution of the

42

overpayment issue would still have occurred after all of the disputed payments had already been made. Given these facts, the equities do not support a laches finding.[19]

Thus, we conclude that the Board is not barred by theories of equitable estoppel or laches from recouping the benefits improperly paid to PFRS retirees based on an inflated number of pensionable holidays for fiscal years 2009, 2010, and 2011. However, the trial court in this case ordered the Board "to develop and implement a plan to recover the overpayments" made to PFRS retirees. To the extent this order mandates that the Board act in a particular manner with respect to the identified overpayments, it was error. Rather, as discussed at length above, the Board has discretion regarding how its miscalculations should be handled. The matter should therefore be remanded to the Board so that it can exercise this discretion subject, if necessary, to additional judicial review.

## III. DISPOSITION

The judgment and writ of mandate are vacated, and the matter is remanded to the trial court to fashion new relief consistent with this opinion. Each party to bear its own costs.

---

[19] The cases cited by the Association in support of its laches claim do not change our opinion. Both *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61 (*Johnson*) and *Womack v. San Francisco Community College Dist.* (2007) 147 Cal.App.4th 854 (*Womack*) involved public employees seeking writ review of adverse personnel decisions. The exigencies involved in such cases—where success could lead to thorny reinstatement and back pay issues—strike us as different in magnitude from those generated by the pension overpayments at issue in these proceedings. (See *Johnson, supra,* 24 Cal.4th at pp. 68-69; *Womack, supra,* 147 Cal.App.4th at pp. 864-866.)

_____
REARDON, ACTING P. J.

We concur:


_____
RIVERA, J.


_____
HUMES, J.

*City of Oakland v. Oakland Police and Fire Retirement et al.* A136769

44

Trial Court:                                    Alameda County Superior Court


Trial Judge:                                    Hon. Evilio M. Grillo


Counsel for Plaintiff and Respondent:           Nossaman LLP
                                                Stephen N. Roberts
                                                James H. Vorhis

Counsel for Appellants:                         Olson Hagel & Fishburn
                                                Richard C. Miadich


Counsel for Intervenors:                        Davis, Cowell & Bowe, LLP
                                                W. David Holsberry
                                                Sarah Grossman-Swenson


*City of Oakland v. Oakland Police and Fire Retirement* A136769


45